UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Corliss Larsen Bauer,

        Plaintiff,

  vs.

Social Security Administration,

        Defendant.         Civ. No. 08-6088 (RHK/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

The Plaintiff commenced this action, pursuant to Section 405(g) of the Social Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the Commissioner's final decision which denied her application for Disability Insurance Benefits ("DIB").  The matter is now before the Court upon the parties' cross-Motions for Summary Judgment.  The Plaintiff has appeared pro se, and the Defendant has appeared by Lonnie F. Bryan, Assistant United States Attorney.  For reasons which follow, we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's Motion be denied.

## II. Procedural Background

The Plaintiff protectively filed for Social Security Disability Benefits ("DIB") on September 30, 2004, and alleged an onset date of December 1, 2000, with a date last insured of December 31, 2000. [T. 74]. Her application was initially denied on January 12, 2005, and upon reconsideration on May 25, 2005. Id. The Plaintiff requested a Hearing, which was held before an Administrative Law Judge ("ALJ") on August 12, 2006, at which time, the Plaintiff appeared and testified, and was represented by legal counsel. Id.; [T. 448-75]. The Plaintiff was also represented by another, who did not appear at the Hearing, but who submitted additional documents thereafter. Id. William Rutenbeck ("Rutenbeck") appeared at the Hearing as Vocational Expert ("VE"). Id. After the supplemental documents were submitted, the ALJ held a supplementary Hearing, on September 26, 2006. [T. 440-47]. The Plaintiff appeared at the supplementary Hearing and was represented by legal counsel, but only the VE, who was Mitchell J. Norman ("Norman"), testified. Id. The ALJ issued her decision on January 10, 2007, and found that the Plaintiff was not disabled as of her date last insured -- December 31, 2000. [T. 84].

The Plaintiff filed a request for review of the ALJ's decision, and submitted additional records for consideration by the Appeals Council, in addition to several

letters. [T. 5, 409-439]. However, on August 27, 2008, the Appeals Council denied

the request for further review. [T. 6-9]. As a consequence, the ALJ's determination

became the final decision of the Commissioner. See, Sims v. Apfel, 530 U.S. 103,

106-07 (2000); Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005); Steahr v.

Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44

(8th Cir. 1997); Title 20 C.F.R. §404.981.

### III. Administrative Record

A.  Factual Background.  The Plaintiff was forty-five (45) on the date last

insured. [T. 83]. The Plaintiff completed college in 1977, [T. 146], and according to

her reports to the Social Security Administration ("SSA"), her impairments began in

January of 2000, and she stopped working on December 1, 2000. [T. 119, 141].  In

her application for DIB, the Plaintiff alleged that she was unable to work due to her

depression, and "considerable ADD," which limited her ability to concentrate.  [T.

140-41].  In addition to those impairments, the ALJ found severe impairments of

obesity, chronic sinusitis, and bilateral chondromalacia/patellofemoral syndrome. [T.

76].

1.      <u>Medical Records as to Physical Impairments</u>.[1]  On January 5, 1994, the Plaintiff was seen at the North Suburban Family Physicians Clinic ("North Suburban") with nasal congestion, and facial pain for the preceding ten (10) days.  [T. 405].  The Plaintiff was assessed with sinusitis and a left ear canal lesion, and was prescribed Amoxicillin.[2]  <u>Id.</u>  On February 11, 1994, the Plaintiff was seen at the MidWest Ear, Nose, and Throat Clinic ("MidWest"), for choanal atresia, and reported constant pain in her left ear, and a recent bout of bad sinusitis.  [T. 202, 323, 343].  Upon examination, the physician noted that the Plaintiff had difficulty breathing through her nose, and a significant septal deformity.  <u>Id.</u>  The Plaintiff and the physician discussed surgery for the septal deformity.  <u>Id.</u>  On March 4, 1994, MidWest canceled the surgery, because of congestion, and the Plaintiff was referred for RAST allergy testing.  <u>Id.</u>

On March 14, 1994, the Plaintiff was seen at North Suburban for sinus symptoms which were not being fully resolved with antibiotics.  [T. 404].  The

---

[1] The Plaintiff has submitted a number of documents which are not related to the ALJ's findings, or to the Plaintiff's claimed impairments, such as the results of mammograms.  [T. 398].  We have summarized only the relevant documents.

[2] Amoxicillin is "a synthetic derivative of ampicillin effective against a broad spectrum of gram-positive and gram-negative bacteria." <u>Dorland's Illustrated Medical Dictionary</u> at 66 (31st Ed. 2007).

physician observed that the Plaintiff's "TM" was mildly inflamed, and that the nasal mucosa on the left side was fairly boggy and inflamed, with a purulent discharge. Id. The physician assessed chronic and recurring sinusitis, and the Plaintiff was prescribed Augmentin,[3] and Nasalide[4] nose spray. Id.

On March 23, 1994, the Plaintiff was seen at MidWest, where her RAST results returned negative for all antigens tested, and the Plaintiff was referred to Dr. Carley for further direction. [T. 201, 321, 342]. On March 29, 1994, the Plaintiff was still experiencing a marked amount of problems with her nose, and examination revealed deflection of the septum to the left. Id. A CT scan from March 30, 1994, revealed mild mucoperiosteal thickening; bilateral maxillary sinuses that were markedly hypoplastic, and showed small atretic appearing infundibula; a complex septal deviation to the left at one part, and to the right at another; and patent appearing sphenoethmoidal recesses and nasofrontal ducts. Id. On March 31, 1994, the

---

[3]Augmentin is an "oral antibacterial combination," which is "indicated in the treatment of [certain] infections." Physicians' Desk Reference, at 1331, 1333 (64th Ed. 2010).

[4]Nasalide is the "trademark for a preparation of flunisolide," Dorland's Illustrated Medical Dictionary, at 1251 (31st Ed. 2007), which is used for the "treatment of allergic rhinitis and other inflammatory nasal conditions." Id. at 729.

physician assessed the Plaintiff with hypoplastic sinuses, with problems mostly occurring intranasally, and septal surgery was recommended.  Id.

The Plaintiff not was seen again until November 17, 1994, when she reported good health, and decided to have the septal surgery, [T. 200, 322, 341], which she underwent in December of 1994.  In a medical note from December 29, 1994, it was related that the Plaintiff was healing nicely.  [T. 199, 320, 340].  However, a few months later, on March 27, 1995, the Plaintiff was seen at North Suburban for weakness, aches, and slight nasal congestion, [T. 402], and on July 10, 1995, the Plaintiff returned to MidWest with complaints of sinus infections, nasal infections, and excessive drainage.  [T. 198, 319, 339].  Examination revealed "some swelling in the nose bilat[erally]" and drainage, and the physician prescribed Biaxin.[5]  Id.

A CT scan, from July 11, 1995, revealed an interval increase in the mucoperiosteal thickening in the left maxillary sinus, bilateral nasofrontal ducts, and bilateral sphenoethmoidal recesses; an interval decrease in mucoperiosteal thickening in the left maxillary sinus, with apparent widening of atretic infundibulum; the right maxillary sinus was improved in pneumatization; the septal deviation had decreased;

_____

[5]Biaxin is "indicated for the treatment of mild to moderate infections caused by susceptible strains of the designated microorganisms in [certain] conditions," such as "acute maxillary sinusitis."  Physicians' Desk Reference, at 415 (64th Ed. 2010).

and there was an appearance of interval onset of nasofrontal duct opacification.  Id.
The Plaintiff was seen again on August 3, 1995, when she reported that she was
feeling much better, but the CT scan showed "some chronic ethmoid disease," and that
she "bilaterally ha[d] hypoplastic maxillary sinuses," and the physician opined that the
Plaintiff's problems were "probably [] due to vasomotor rhinitis that causes a
secondary ethmoiditis."  [T. 197, 318, 338].  The physician recommended bilateral
endoscopic ethmoidectomies, id., but there are no records which document that the
Plaintiff underwent that second recommended surgery.

The Plaintiff returned to North Suburban on March 8, 1996, with symptoms of
a cold that had lasted three (3) days, with a minimal amount of sinus congestion, but
clear drainage, and she related that she was concerned because she was going to take
an airplane the next day, in order to go skiing.  [T. 397].  The physician assessed viral
"URI" with probable eustachian tube dysfunction, and recommended Afrin and
Sudafed for the air travel, and for skiing.  Id.  A year later, the Plaintiff returned to
North Suburban on March 21, 1997, with complaints of a sore throat, congestion, a
runny nose, and weepiness, but she had nontender sinuses, [T. 391], and the physician
recommended fluids, and alternating Tylenol and Advil. [T. 392].

Almost one (1) year later, on February 13, 1998, the Plaintiff was seen for a sinus infection by Dr. William G. Jones, [T. 191-92], and he observed a thick discharge and recommended acidophillus. [T. 192]. On February 16, 1999, Dr. Jones completed an employment health form, for the United States Postal Service, in which he stated that he had treated the Plaintiff for acute sinusitis in early 1999,[6] and had also treated her for acute sinusitis in February of 1998, and possibly in November of 1998,[7] from which she had recovered. [T. 193]. Those treatments are reflected in Dr. Jones's brief notations, which list the Plaintiff's complaints as nasal congestion and coughing, on February 13, 1998, November 12, 1998, November 23, 1998, and February 9, 1999. [T. 192]. In addition, Dr. Jones opined that the Plaintiff's acute sinusitis was "temporary," and that she was recovering with a good prognosis, and that she did not require any physical restrictions, in February of 1999. [T. 193].

Dr. Jones also completed a Patient History Sheet on January 16, 1998. [T. 194-196]. The history relates that the Plaintiff had previously undergone a tonsillectomy,

---

[6]Dr. Jones appears to have mistranscribed the dates of his treatment of the Plaintiff in 1999, as he wrote that he treated her from "7/2/1999" to "2/9/1999." [T. 193].

[7]Dr. Jones's handwritten notes are somewhat difficult to read, but it appears that, in November of 1998, he treated the Plaintiff for an infection of some sort, as well as bronchitis. [T. 193].

a broken ankle, a caesarean section, and repair of a deviated septum, and reports a diagnosis of depression, as well as of chronic sinus infections, which were reported to have been occurring for the previous ten (10) years. [T. 194]. The history also relates the Plaintiff's report, that she had previously taken Prozac[8] for approximately four (4) months, but had stopped because of its side-effects. Id. Dr. Jones noted that the Plaintiff "dulled easily," and was wordy, and the Plaintiff related that she loved to read and rollerblade. [T. 195]. The Plaintiff weighed 170 pounds at that time. Id.

On June 12, 1998, the Plaintiff was seen at North Suburban for pain in her left great toe joint, and she reported that she was not taking any medications except progesterone. [T. 390]. The physician diagnosed acute arthritis of that joint, and prescribed Indocin,[9] but did not place the Plaintiff on any restrictions. Id.

During the year 2000, the Plaintiff was seen for a gynecological exam on March 14, 2000, [T. 218], for the treatment of a bunion, hammertoes, and an ingrowing right

---

[8]Prozac is "a selective serotonin reuptake inhibitor," and is indicated for the treatment of a number of conditions, including Major Depressive Disorder, Obsessive Compulsive Disorder, Bulimia Nervosa, and Panic Disorder. See, Physicians' Desk Reference, at 1941 (64th Ed. 2010).

[9]Indocin is indicated for the treatment of moderate to severe rheumatoid arthritis. Id. at 2168.

toenail, on May 19, 2000, [T. 345], and had an office visit with her gynecologist, who did not examine the Plaintiff, at her request, on September 12, 2000. [T. 217].

On January 9, 2001, the Plaintiff was treated at the Stillwater Medical Group for painful hammertoes, which had become very sore while she was cross-country skiing. [T. 344]. The physician discussed surgical options with the Plaintiff, but she requested treatment with toe pads instead. Id. On August 10, 2001, the Plaintiff was treated at the Fairview Lakes Medical Center for pain in her right foot, [T. 379], and on August 6, 2001, the Plaintiff reported a history of medial knee pain, which had been exacerbated by increased activity. [T. 380]. The Plaintiff reported that she was biking regularly, had not reduced that activity because of her knee pain, and had also been rollerblading earlier in the season. Id. The physician noted some laxity of the collateral ligaments, and some tenderness with palpation, and diagnosed right medial plica syndrome. Id. The physician recommended a reduction in activities, such as biking, and treatment with ibuprophen and ice, and possible physical therapy. Id.

On February 7, 2002, the Plaintiff was seen at the Fairview-University Medical Center by Dr. Jyonouchi, for an evaluation of her chronic sinus infections, or "CRS". [T. 233]. The Plaintiff related that her sinusitis had lasted for three (3) to four (4)

weeks, and that she had last had sinusitis in August of 2001,[10] id., and the physician recommended preventative measures for her sinus infections, including Singulair,[11] an inhaler of Nasonex,[12] and a humidifier, as well as an illegible medication, for one (1) month.  [T. 235, 337].  The physician recommended that the Plaintiff return in one (1) month for a follow-up.  Id.

On February 27, 2002, the Plaintiff was seen at the Joint Replacement & Arthritis Center by Richard C. Reut, D.O.  [T. 326-27].  The Plaintiff reported that she was experiencing some knee pain, after having fallen during a snowboarding lesson, and she asked Dr. Reut if she would be able to attend another lesson that afternoon. [T. 326].  The Plaintiff also complained of aches when she climbed stairs, but denied locking, swelling, or instability, and reported that she was currently using ibuprofen for pain.  Id.  Dr. Reut completed a physical exam, and observed that the Plaintiff had

---

[10]There are no records relating to the Plaintiff's reported sinusitis episode in August of 2001.

[11]Singulair is "indicated for the prophylaxis and chronic treatment of asthma in adults and pediatric patients 12 months of age and older."  Physicians' Desk Reference at 2274 (64th Ed. 2010).

[12]Nasonex is "indicated for the treatment of the nasal symptoms of seasonal allergic and perennial allergic rhinitis," and for the "prophylaxis of the nasal symptoms of seasonal allergic rhinitis."  Id. at 3166.

a normal gait, and no obvious effusion, but that the left knee seemed slightly swollen, with quite a bit of patellofemoral crepitation, in both the left and right knees.  Id.  Dr. Ruet also noted that the Plaintiff's active flexion was 0/140 degrees, that the knees were "ligamentously lax," and that there was excessive movement in the knee joints in all four (4) planes, but that there was a solid end joint, with no joint line tenderness. Id.

The weight bearing x-rays showed some increased joint space narrowing of left-side medial compartment, some irregularities in the articular surface of the patellofemoral joint, and patellar compression caused some discomfort, patellar mobilization was 2+ medially and laterally, with good quad tone, fair VMO tone fair, and good hamstring flexibility.  [T. 327].  Dr. Reut diagnosed chonfromalacia/ patellofemoral pain, which had been aggravated by the snowboard fall, in a stable joint with no signs of internal derangement, and he recommended Physical Therapy, Celebrex[13] samples, activities as tolerated, and a follow-up visit if needed.  Id.  On April 2, 2003, the Plaintiff was restricted from leg extensions, and squatting below parallel. [T. 330].

---

[13]Celebrex is used for the treatment of osteoarthritis, rheumatoid arthritis, ankylosing spondylitis, acute pain, primary dysmenorrhea, and familial adenomatous polyposis.  See, Physicians' Desk Reference at 3273 (64th Ed. 2010).

The Plaintiff participated in physical therapy on March 8, 2002, and Physical Therapist Meghan M. Reistchel ("Reistchel") noted that the Plaintiff reported bilateral knee pain with ambulation, sporting activities, and while using stairs. [T. 229]. Reistchel placed the Plaintiff on no work restrictions, and opined that the overall rehabilitation potential was good. [T. 228]. The Plaintiff participated in physical therapy, again, on March 12, 2002, with mild pain and difficulty. [T. 227]. In a Discharge Summary dated April 17, 2002, Reistchel noted that the Plaintiff's overall condition had not significantly changed, and that the Plaintiff had been doing her home exercise program once per day, but had cancelled her physical therapy appointments three (3) times, without calling to reschedule, and that the Plaintiff had reported that the sessions would not fit into her schedule. [T. 222-23 (Discharge Summary); 224 (cancellation on April 15, 2002); 225 (cancellation on April 10, 2002); and 226 (cancellation on March 15, 2002)].

On March 21, 2002, the Plaintiff returned to the Fairview-University Medical Center for CRS, fatigue, and depression. [T. 232]. The physician noted that the Plaintiff was taking Celebrex for knee pain, Singular and Nasonex, and another medication which is illegible. [T. 231]. During the physical exam, the physician noted no abnormalities, except that the Plaintiff's nose had "more patent nasal

passages," and another notation, that is illegible.  Id.  The physician further noted that, overall, the Plaintiff's nasaocular symptoms had improved, but that she was still experiencing fatigue and depression.  [T. 232].

More than two (2) years later, on April 15, 2004, the Plaintiff was seen at the Fairview Lakes Medical Center for sinusitis and environmental allergies.  [T. 376].  The physician prescribed Nasonex and Singulair.  Id.  Several months later, on February 1, 2005, the Plaintiff was seen at the Fairview Lakes Medical Center for influenza, including symptoms of cough, sinus pain, and sore throat.  [T. 374].

On April 26, 2005, the Plaintiff was seen by Dr. Joseph Campanelli, with complaints of acute maxillary sinusitis, and hypertrophic turbinates.  [T. 258, 316].  The Plaintiff reported a twenty (20) year history of sinus problems, and stated that she experienced one (1) to three (3) "severe episodes" per year.  Id.  The Plaintiff reported that her most recent infection was in February of 2005, and she also related that she was filing a disability claim, due to her chronic sinusitis, but had come to see him because she was going out of town for her fiftieth (50th) birthday, had started to develop a sinus infection, and did not want to miss the trip.  Id.  The Plaintiff related

that she was taking Nasonex and Singulair, as well as Trazodone[14] and Celexa,[15] and that her last treatment with antibiotics had been approximately two (2) years before. Id.

Dr. Campanelli completed a physical exam, in which he noted that all systems were negative, except for pain, weakness, and numbness in her knees. Id. Dr. Campanelli also noted the Plaintiff's reports of depression and decreased immunity, id., and observed that the Plaintiff was cooperative, in no significant distress, and had appropriate communication skills. [T. 259, 317]. He also observed that the Plaintiff's maxillary and frontal sinuses were non-tender to palpation, but that the left ear canal showed a incudomyringostapediopexy, the nose showed some erythema of the skin, the right side of the nose was clear, with some mucoid drainage, and that the left side showed an edematous turbinate. Id. Dr. Campanelli diagnosed acute maxillary sinusitis, prescribed Augmentin, and suggested a sinus rinse kit for when Plaintiff returned from her trip, and a good regimen of preventative care. Id. Dr. Campanelli

[14]Trazodone hydrochloride is "an antidepressant used to treat major depressive episodes with or without prominent anxiety." Dorland's Illustrated Medical Dictionary at 1983 (31st Ed. 2007).

[15]Celexa is "an orally administered selective serotonin reuptake inhibitor (SSRI)" which "is indicated for the treatment of depression." Physicians' Desk Reference at 1152-53 (64th Ed. 2010).

also noted that "the hypertrophic turbinates that she has which are affecting her nasal breathing should be addressed" as well.  Id.  There is no evidence that the Plaintiff returned to Dr. Campanelli to follow up on the recommended preventative care.

On February 23, 2005, the Plaintiff was seen by Dr. Richard Bae at the Abbot Northwestern Minneapolis Heart Institute, for a "jabbing feeling" in her heart.  [T. 309].  Dr. Bae observed that the Plaintiff was pleasant, and related her report that she had been experiencing some chest symptoms and arm pain, but that this had not affected her activity level, and she was able to bike ten (10) miles without exertional symptoms.  Id.  Dr. Bae assessed chest pain with some atypical features, and recommended an exercise echocardiogram to rule out any significant ischemia.  [T. 311-12].  The echocardiogram revealed no ischemia.  [T. 268].

On June 20, 2006, the Plaintiff was seen by Dr. Kent Wilson, in order to obtain an assessment for her upcoming DIB Hearing.  [T. 260, 315].  The Plaintiff reported that she was not feeling ill at the time, but that she experienced five (5) to fifteen (15) episodes of rhinonasal infections per year, that she was weak, tired, and without energy, for two (2) to three (3) weeks after each infection, and that she was currently

taking Nasonex, Ambien, Wellbutrin,[16] and Singulair.  Id.  Upon a physical examination, Dr. Wilson observed that the Plaintiff was alert and cooperative, with a mild left septal deflection with minimal edematous nasal mucosa, and slight mucous in the nasopharynx, but that all else was normal.  Id.  Dr. Wilson noted that he "indicated to [the Plaintiff] that at this point I could not find evidence of advanced sinus disease, so I recommended CT study of the paranasal sinuses and a recheck in 1-2 weeks."  Id.

On June 27, 2006, the Plaintiff followed up with Dr. Wilson to review her CT scan, [T. 48], and Dr. Wilson reported that the scan demonstrated moderate right septal deflection, with normal turbinal structures and sinuses, but small maxillary sinuses with congestion of the right nasal mucosa, which was compatible with normal function.  Id.  Dr. Wilson concluded that the findings were normal, and that no surgical or medical intervention was required at that time.  Id.[17]  In addition, Dr. Wilson completed a short questionnaire, which was sent to him by the Plaintiff's representative, on August 2, 2006, in which he circled the answer that the Plaintiff

---

[16]Wellbutrin is "indicated for the treatment of major depressive disorder." Physicians' Desk Reference, at 1720 (64th Ed. 2010).

[17]This record was not submitted to the ALJ, but appears to have been submitted to the Appeals Council.

would not be able to tolerate more than minimal fumes, odors, dusts, gases, and the like, for full time work, and that this would appear to have been the case since December of 2000. [T. 408].

On December 8, 2006, the Plaintiff was seen by Dr. Eric T. Becken, for an upper respiratory infection, chronic rhinitis, and acute serous otitis media. [T. 49]. The Plaintiff related that she had been taking antibiotics for a sinus infection, which were not helping. Id. The nasal exam showed mild erythema of the mucosa, no significant drainage, and no purulence, but some thicker drainage. Id. At that time, the Plaintiff expressed interest in surgery to decrease the likelihood of sinus infections, and Dr. Becken recommended she follow up in two (2) weeks. Id.

On January 8, 2007, the Plaintiff was seen by Dr. Bradley D. Johnson, D.O., at the Oakdale Ear, Nose, and Throat Clinic ("Oakdale"), for chronic sinusitis. [T. 45-46]. The Plaintiff reported symptoms for the past fifteen (15) years, and that she was looking into surgery, because antibiotics and other medications had not improved her symptoms. [T. 46]. Dr. Johnson's examination revealed no acute distress, communication without difficulty, and that the Plaintiff's other systems were normal, with the exception of the slight deflection in her nasal septum, "with inferior turbinate hypertrophy and marked congestion within the middle meatus bilaterally." Id. Dr.

Johnson prescribed Clindamycin[18] for two weeks, discussed surgery, and recommended a follow-up appointment. [T. 45].

The Plaintiff followed up with Dr. Johnson on January 25, 2007, and related no improvement on the Clindamycin. [T. 44]. Dr. Johnson noted that a CT scan revealed "inferior turbinate hypertrophy with a slight deviation of her nasal septum," and "hypoplastic maxillary sinuses with moderate mucosal thickening to severe mucosal thickening on the right," and "an obstruction of her left ostiomeatal complexes." [T. 42, 44]. The Plaintiff agreed to surgical intervention, [T.44], but the Record does not contain any records related to any such surgery.

On September 24, 2007, Dr. Rick Bosacker sent a letter to the SSA, in which he related that he had been treating the Plaintiff for the last year, which pertained to colitis resulting from antibiotic use from her chronic rhinitis and sinusitis, and that, although he did not treat her for her mental health concerns, that it appeared to him that she had fairly significant depression, which made it difficult for her to stick to plans, and to work. [T. 15, 16].

---

[18]Clindamycin is "a semisynthetic analogue of the natural antibiotic lincomycin," and "is effective primarily against gram-positive bacteria." Dorland's Illustrated Medical Dictionary at 378 (31st Ed. 2007).

On December 22, 2007, the Plaintiff was admitted to Unity Hospital with complaints of chest pain. [T. 19]. The Plaintiff appeared very anxious, [T. 20], and Dr. Raza A. Khan observed that the Plaintiff was tangential in her speech, and reported that she could not work due to her chronic sinusitis. [T. 19]. Dr. Khan ordered testing, in order to rule out a myocardial infarction, and also ordered a psychiatric consultation, so as to assist with the possible anxiety attack, or a possible personality disorder. [T. 21]. The Plaintiff's chest x-ray was normal, [T. 27], and all of her other tests were normal, except that the EKG revealed some "nonspecific ST abnormalities as 98 beats per minute." [T. 33, 37]. The diagnoses on discharge were chest pain due to anxiety, anxiety disorder with panic attacks and agoraphobia, depression, probable histrionic personality disorder, and elevated blood pressure. [T. 17].

As to the Plaintiff's obesity impairment, on July 25, 1997, the Plaintiff's gynecologist recommended that the Plaintiff, who weighed 178 pounds at that time, reduce her weight. [T. 242]. At an exam, on March 14, 2000, the Plaintiff weighed 196 pounds, [T. 218], and her weight remained stable, around 200 pounds, thereafter. [T. 234 (2002), 238 (2004), 309 (2005), 374 (2005)]. The Plaintiff was treated for obesity with Meridia, in March of 2002, [T. 377], and on March 5, 2002, the Plaintiff

reported that she was a member of the Y, and that she was "swimming regularly," but that it was not helping as much as she had hoped.  [T. 378].

With respect to medications, there are notes in several medical records which indicate that the Plaintiff was taking Zoloft[19] at various times, [T. 217, 345], which is also reflected in the pharmacy records from 1998, 1999, and 2000.  [T. 175-76].  In addition, in a medication list from the Target Pharmacy, between July 1, 2002, and June 26, 2006, the Plaintiff filled prescriptions for the following medications, in addition to Singulair and Naxonex:  clindamycin, Celexa, Trazodone, doxycycline, tetracycline, Differin, zoderm, Elidel, citalopram, amox tr-k, Ambien, bupropion, Concerta permethrin, and cephalexin.[20]  [T. 172-73].  Another pharmacy record, from

---

[19]Zoloft is a "trademark for preparations of sertraline hydrochloride," Dorland's Illustrated Medical Dictionary at 2120 (31st Ed. 2007), which is "used to treat depressive, obsessive-compulsive, and panic disorders."  Id. at 1724.

[20]Doxycycline is "a semisynthetic broad-spectrum antibacterial of the tetracycline group."  Id. at 572.

Tetracycline is "any of a group of related broad-spectrum antibiotics," which are "effective against a wide range of aerobic and anaerobic gram-positive and gram-negative bacteria."  Id. at 1930.

Differin is a "trademark for a preparation of adapalene," id. at 524, which is "a synthetic retinoic acid analogue applied topically in the treatment of acne vulgaris."  Id. at 26.

(continued...)

August 1, 2006, to August 21, 2007, shows that the Plaintiff had filled prescriptions

---

[20](...continued)

Elidel is "indicated as a second-line therapy for the short-term and non-continuous chronic treatment of mild to moderate atopic dermatitis in nonimmunocompromised adults and children 2 years of age and older." Physicians' Desk Reference at 2424 (64th Ed. 2010)[emphasis omitted].

Citalopram hydrobromide is "a selective serotonin reuptake inhibitor (SSRI), chemically unrealted to other SSRI's," and is used "as an antidepressant." Dorland's Illustrated Medical Dictionary at 372 (31st Ed. 2007).

Ambien "is indicated for the short-term treatment of insomnia characterized by difficulties in sleep initiation." Physicians' Desk Reference, at 2921 (64th Ed. 2010).

Bupropion hydrochloride is "a monocyclic compound structurally similar to amphetamine, used as an antidepressant and as an aid in smoking cessation." Dorland's Illustrated Medical Dictionary at 265 (31st Ed. 2007).

Concerta is indicated for the treatment of Attention Deficit Hyperactivity Disorder (ADHD)." Physicians' Desk Reference, at 2599 (64th Ed. 2010).

Permethrin is a "pyrethroid insecticide applied topically in the treatment of infestations," and is "also applied to objects such as bedding and furniture." Dorland's Illustrated Medical Dictionary, at 1440 (31st Ed. 2007).

Cephalexin is "a semisynthetic first-generation cephaolsporin, effective against a wide range of gram-positive and a limited range of gram-negative bacteria," and is administered "in the treatment of tonsillitis, otitis media, and infections of the genitourinary tract, of bones and joints, and of skin and soft tissue." Id. at 335.

for Ambien, Differin, Prednisone, "amox," avelox, metronidazol, proctofoam, lidocaine, and zolpidem.[21] [T. 47].

        2.    <u>Medical Records as to Mental Impairments</u>. The Record contains a letter from Barbara A. Hanson, Ph.D., at the Arden Woods Psychological Services, P.A., ("Aden Woods") dated November 26, 2003, [T. 215], in which Dr. Hanson relates that she treated the Plaintiff from January 10, 1996, to June 12, 1996, for

---

[21]Prednisone is a "synthetic glucocorticoid derived from cortisone, administered orally as an antiinflammatory and immunosuppressant in a wide variety of disorders." <u>Dorland's Illustrated Medical Dictionary</u> at 1531 (31st Ed. 2007).

Avelox is "indicated for the treatment of adults * * * with infections caused by susceptible strains of the designated microorganisms," in conditions such as acute bacterial sinusitis, among others. See, <u>Physicians' Desk Reference</u> at 3068 (64th Ed. 2010).

Metronidazol is "an antiprotozoal and antibacterial effective against obligate anaerobes," and is used in the treatment of bacterial vaginosis, among others. <u>Dorland's Illustrated Medical Dictionary</u>, at 1172 (31st Ed. 2007).

Proctofoam HC is "used to relieve anorectal inflammation, pain, swelling, and pruritus." <u>Id.</u> at 1544.

Lidocaine is "a drug having anasthetic, sedative, analgesic, anticonvulsant, and cardiac depressant activities, used as a local anesthetic, applied topically to the skin and mucous membranes." <u>Id.</u> at 1048.

Zolpidem tartrate is "a non-benzodiazepine sedative-hypnotic administered orally in the short-term treatment of insomnia." <u>Id.</u> at 2120.

diagnoses of Attention-Deficit/Hyperactivity Disorder ("ADHD"), Predominantly Hyperactive-Impulsive Type, and that some unspecified testing was completed on January 17, 1996, and February 26, 1996. Id. Dr. Hanson also relates that all of the clinical records had been destroyed by the clinic, and that the only records available on the computer were the Plaintiff's identifying information, diagnosis, and the dates and types of services provided. Id.

On March 27, 1996, Dr. Hanson referred the Plaintiff to the Roseville Clinic - Mental Health Services ("Roseville Clinic") for assessment of ADHD and depression. [T. 409].[22] The Plaintiff was seen by Dr. Paul F. Goering, at which time, she related a "long and complicated history of inattentiveness and depression." Id. Specifically, the Plaintiff related trouble with restlessness, fidgeting, waiting, a tendency to blurt things out, difficulty completing tasks, poor motivation, aggravation because she could not finish tasks, frequent forgetfulness, moving from one task to another without finishing, inattentiveness in conversation, irritability, and job conflict. Id. The Plaintiff also described symptoms of depression, since college, and for the past nine (9) years, with a loss of enjoyment, sadness, tearfulness, ruminating on the past,

---

[22]The Record demonstrates that the medical records from the Roseville Clinic were not before the ALJ, but were submitted to the Appeals Council after the ALJ issued her decision. [T. 5, 7].

disturbed sleep, and poor concentration due to the sleep issues.  Id.  In addition, the Plaintiff reported that her interests in reading, skiing, tennis, and rollerblading continued, but that she did them somewhat less, and tended to isolate herself.  Id. The Plaintiff denied any suicidal ideation.  Id.

The Plaintiff stated that she felt that she was making slow progress with Dr. Hanson, and related her history of sinusitis and septal surgery. [T. 410]. Dr. Goering completed a mental status exam, in which he observed that the Plaintiff was casually kempt, in no acute distress, and that, while the Plaintiff made an initial impression of being irritable, gruff, or unpolished, she was pleasant and cooperative. [T. 411]. Dr. Goering noted that the Plaintiff's voice was of normal rate and rhythm, her eye contact was normal, and there was no motor disturbance.  Id.  In addition, the Plaintiff exhibited a logical thought process that was goal directed, but frequently overinclusive of detail, and Dr. Goering observed that the Plaintiff told her story in a very controlling and obsessive fashion, but that there was no evidence of delusion, paranoia, or other psychotic symptoms.  Id.

Dr. Goering also observed that the Plaintiff was cognitively intact, well-oriented, with a good fund of knowledge, and normal impulse control, from the exam and from the history she related, and above average in intelligence, but he noted that

her insight into her illness was somewhat limited.  Id.  Dr. Goering diagnosed Depressive Disorder NOS, R/O Atypical Major Depression; Dysthymia; ADD; passive aggressive and narcissistic traits; chronic sinus infections; and a Global Assessment Function ("GAF") score of 70.[23]  Id.  Dr. Goering recommended a screening EKG, individual therapy with Dr. Hanson, the initiation of imipramine,[24] and a follow-up appointment in six (6) weeks.  [T. 412].

The Plaintiff saw Dr. Goering for a follow-up appointment on May 28, 1996, in which she reported some dry mouth from the imipramine, and related that she was not sure if she felt better on the medication, but also reported a more stable mood, less irritability, less anger, better sleep, less crying, less ruminating, improved emotional resiliency, and improved focus and comprehension, but that she continued to isolate herself, had poor optimism, and still procrastinated, was distractible, and forgetful. [T. 413].  The EKG had returned normal results and, in the mental status exam, Dr.

---

[23]A GAF score between 61 and 70 indicates "some mild symptoms * * * OR some difficulty in social, occupational or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, [and] has some meaningful interpersonal relationships." Diagnostic and Statistical Manual of Mental Disorders at 34 (4th Ed. 2000).

[24]Imipramine is "a tricyclic antidepressant." Dorland's Illustrated Medical Dictionary, at 929 (31st Ed. 2007).

Goering noted that the Plaintiff was fifteen (15) minutes late, had many questions, and appeared to have an improved mood.  Id.  Dr. Goering adjusted his diagnoses slightly, to ADD, Depressive Disorder NOS, Dysthymia, and he recommended continuing with the imipramine at a higher dosage, with a follow-up appointment in four (4) weeks, and continued therapy.  Id.

The Plaintiff did not seek treatment with Dr. Goering again until October 24, 1996, when she related that she had failed to come to an appointment in July because she had been traveling.  [T. 414].  The Plaintiff reported that she continued to take imiparmine, and that she felt better, had improved sleep, energy, and mood, reduced tearfulness, and improved attention, but not completely, and that she was still sensitive to the opinions of other people.  Id.  The Plaintiff also related that she was no longer seeing Dr. Hanson for therapy.  Id.  Dr. Goering noted that the Plaintiff was pleasant and cooperative, in no acute distress, her affect was full-ranging, her mood was "good," and there was no evidence of psychosis or cognitive disturbance.  Id.  Dr. Goering noted his diagnoses of Depressive Disorder NOS, which was improved on imipramine; ADD, which was also improving; and Dysthymia, which was his primary diagnosis.  Id.  Dr. Goering recommended that the Plaintiff return to therapy, and they

discussed the addition of Prozac to imipramine, with a level of medication to be taken in two (2) weeks, and a follow up in four (4) to (6) weeks. Id.

The Plaintiff was seen for the final time by Dr. Goering on December 2, 1996. [T. 415]. The Plaintiff reported that she had begun taking Prozac, but that she was inconsistent with her medications, due to forgetfulness. Id. However, the Plaintiff related that she generally felt more optimistic, with improved mood, sleep, energy, and frustration tolerance, but also related that she continued to be sensitive and to procrastinate. Id. Dr. Goering noted that the Plaintiff related no other symptoms consistent with ADHD at that time. Id. In the mental status exam, Dr. Goering observed that the Plaintiff was pleasant, in no acute distress, with no evidence of anxiety or depression, and that she was cognitively intact. Id. He diagnosed Depressive Disorder NOS, which was improved; ADD, which was improving; Dysthymia, primary type; and partial noncompliance with medication. Id. Dr. Goering recommended a decrease in the imipramine, because the Plaintiff had failed to get her medication level checked, and also recommended that the Plaintiff return to therapy, but the Plaintiff declined. Id.

Almost three (3) years later, on August 30, 1999, the Plaintiff was seen by Dr. J. Green, at North Suburban, for a left eye irritation. [T. 386-87]. During that visit,

the Plaintiff reported her history of depression, and that she had previously received a prescription for Zoloft, from her gynecologist, but related that she inconsistently took Zoloft, had been in therapy, but ceased because she did not like her therapist. [T. 387]. Dr. Green discussed depression with the Plaintiff, encouraged her to seek out a new therapist, and suggested a new Zoloft prescription, but cautioned the Plaintiff that she would need to consistently take the medication. Id. The Plaintiff did not take a Zoloft prescription at that time, agreed to return for further discussion with Dr. Green if necessary, id., but did not return.

The Plaintiff sought therapy approximately four (4) years later, in 2003, and was treated by Elaine K. Johnson, who is a Licensed Psychologist, from September 9, 2003, to February 3, 2004, for a total of eighteen (18) hour-long sessions. [T. 213]. In a letter dated November 29, 2004, Dr. Johnson informed the ALJ that she had treated the Plaintiff for significant depressive, interpersonal sensitivity, obsessive-compulsive, and paranoid ideation symptoms. Id. Johnson related that she had completed the Symptom Checklist, [T. 216], Beck Depression Inventory, and the Millon Clinical Multiaxial Inventory, and that the Axis I diagnoses were Delusional Disorder, Generalized Anxiety Disorder, and Adjustment Disorder with Depressed Mood. [T. 213]. Johnson reported that the Plaintiff was treated with medication, and

cognitive/behavioral techniques, with the goal of, among other things, "authoring and pursuing career ambitions." Id.

In her letter, Johnson explained that, from her clinical observations, the Plaintiff "was able to sit, stand, walk, hear, speak, understand, had sustained concentration and persistence, along with good memory skills," but that "[s]he struggled with social interaction and adaptation, especially in difficult interpersonal situations," id., and that the Plaintiff's "diagnosis are [sic] best addressed over a long term, on-going psychotherapeutic relationship," with a good prognosis, but that Johnson had ceased treating the Plaintiff, due to financial concerns. [T. 214].

The Plaintiff was treated by Dr. Thomas Fox, at the North Metro Psychiatry Clinic ("North Metro"), from October 14, 2003, to January 11, 2005, to whom she had been referred by her therapist, who was Johnson at that time, for the evaluation and treatment of depression. [T. 256]. In her intake interview with Dr. Fox, the Plaintiff reported that, over the past year, she had been more depressed, more socially sensitive, more weepy and emotional, and had been withdrawing and ruminating, experiencing a reduction in enjoyment of life, and some anxiety symptoms, but she denied suicidal ideation. Id. The Plaintiff reported that she had never seen a psychiatrist, or been hospitalized for psychiatric reasons, but that she had taken Zoloft years before, and

had experienced some dry-mouth.  Id.  Dr. Fox noted that the Plaintiff's past medical history was unremarkable, and that she was in good medical health, and was not taking medications.  Id.

Dr. Fox completed a mental status exam, during which he observed that the Plaintiff was alert, oriented, cooperative, appeared her age, and maintained good eye contact, with no evidence of a major thought disorder, and no hallucinations or delusions.  Id.  Dr. Fox observed that the Plaintiff cried throughout the interview, and that her mood was depressed, but that her affect was appropriate, and she was cognitively intact, with average to above average intelligence, some dependency issues, and "clearly looked depressed."  Id.  Dr. Fox diagnosed Major Depressive Disorder, id., and encouraged the Plaintiff to continue her participation in therapy, started her on Celexa, and told her to return in one month.  [T. 257].

The Plaintiff returned to Dr. Fox on November 12, 2003, and reported that she was feeling better, but that she did not believe it was because of the medications.  [T. 255].  Dr. Fox noted that the Plaintiff was very agreeable, and noted her concerns of ADD, because of her reports that she "just flit[s] around, etc."  Id.  The Plaintiff reported no side effects from the medications, and Dr. Fox observed that her affect was brighter, which may have been a response to the medications.  Id.

The Plaintiff completed the MCMI-II Test on December 11, 2003, in which the examiner observed that there was reason to believe that "at least a moderate level of pathology characterizes the overall personality organization" of the Plaintiff, with a less than satisfactory hierarchy of coping strategies, and that her foundation for intrapsychic regulation and socially acceptable interpersonal conduct was deficient or incompetent. [T. 352]. The examiner opined that the Plaintiff was subject to the flux of her own enigmatic attitudes and contradictory behavior and, "[a]lthough she is usually able to function on a satisfactory basis, she may experience periods of marked emotional, cognitive, or behavioral dysfunction." Id. In addition, the examiner opined that it was likely that her depression, loneliness, and isolation, were worsening. Id. In his discussion of her Axis I diagnosis, the examiner reported that the Plaintiff's thinking "includes a number of delusional facets (e.g. transient ideas of reference, mixed jealousy, and persecutory beliefs) that interweave with other features to constitute a mini-paranoid episode." [T. 353].

In addition, on the MCMI-II Test, the Plaintiff responded that she sleeps poorly, does not have the energy to concentrate, feels shaky, and has trouble falling asleep because painful memories run through her mind. [T. 354]. The Plaintiff also reported a fear of making friendships, that she avoids most social situations, often criticizes

people strongly if they annoy her, and that people have said that she becomes too interested and too excited about too many things.  Id.  The examiner concluded that the Plaintiff's possible diagnoses were as follows: Delusional (Paranoid) Disorder; Generalized Anxiety Disorder; Adjustment Disorder with Depressed Mood; Avoidant Personality Disorder, of long-term or chronic duration; low self-confidence, and job or school problems.  [T. 355].  As for treatment, the examiner felt that, "[i]f additional clinical data are supporting of the MCMI-II's hypotheses, it is likely that this patient's difficulties can be managed with either brief or extended therapeutic methods."  [T. 356].

On January 8, 2004, Dr. Fox referred the Plaintiff to Joe House, but the Plaintiff reported that she was feeling fine, but could not sleep, and wanted to wait on the Joe House referral.  [T. 255].  The Plaintiff reported no problems with Celexa, and was prescribed a medication for her insomnia.  Id.  The Plaintiff next saw Dr. Fox on February 16, 2004, when she reported that she was feeling better, experiencing no problems with her medications, and Dr. Fox noted a brighter mood, and improvement in her symptoms.  Id.  The Plaintiff's next appointment with Dr. Fox took place eleven (11) months later, on January 11, 2005, when the Plaintiff reported irregular use of medications, and that she felt more depressed, sad, ruminative, negative, and irritable.

[T. 254]. Dr. Fox referred the Plaintiff for neuropsychological testing, due to her reports of cognitive difficulty. Id.

On March 1, 2005, the Plaintiff completed a neuropsychological examination with Charlaine J. Skeel, Psy.D. [T. 209]. Dr. Skeel noted the Plaintiff's diagnoses for anxiety and depression, and noted that the Plaintiff endorsed significant stress and difficulty maintaining attention, losing things, proneness to interrupt others, and difficulty sitting still. Id. The Plaintiff reported her current medications as Celexa and Trazodone, but she could not recall their dosages. Id.

Dr. Skeel administered the following tests: WAIS-R; Bender-Gestalt; Trail Making Test; Wechsler Memory Scale - Revised; Boston Naming Test; Controlled Oral Word Association Test; Test of Variables of Attention (TOVA); WRAT-R; WIAT; Gray Silent Reading Test; GORT-III; Beck Depression Inventory; Beck Anxiety Inventory; MMPI (2"60487'3-9/15: 0.2.15.8.); and the Self-Rating Behavior Checklist. Id. Dr. Skeel concluded that the Plaintiff was cooperative and invested in the testing, so the testing was likely a reasonable estimate of her then present capabilities. [T. 211]. In interpreting the raw data, Dr. Skeel concluded that the Plaintiff was within the average range intellectually, and had adequate abstract and logical reasoning, an extensive vocabulary, and average general knowledge, and that

there was "no apparent concern for intellectual deficits and gross-level cerebral organic impairment is not evident." Id.

With respect to the Plaintiff's ADHD, Dr. Skeel observed that the "TOVA results are valid and the ADHD score positive for attention problems," but that "omission errors of one or two are often statistically more significant than clinically relevant," and the Plaintiff's "slow response time appears due to a cautious test-taking stance." Id. Dr. Skeel also noted that the "Beck Inventories index moderate depression without acute panic features," and that the Plaintiff endorsed the listed symptoms. Id. Further, Dr. Skeel concluded that "[t]he MMPI appears a valid profile suggesting situational turmoil in an individual who feels readily overwhelmed in the face of psychiatric upheaval," and that the "[c]linical scales index mild to moderate depression with mild anxiety in a woman who may exhibit obsessive-like neurotic defenses." Dr. Skeel diagnosed Depressive Disorder NOS; R/O Major Depressive Disorder; and Axis II Deferred, and recommended that the Plaintiff continue with her medications, and that they discuss the Plaintiff's willingness to participate in individual support psychotherapy. [T. 212].

The Plaintiff began treatment for her mental impairments with Dr. Richard Lentz on May 5, 2005. [T. 265]. In her initial visit, Dr. Lentz noted that the Plaintiff

was "dissatisfied with her prior psychiatrist, stating she thinks she has a valid case for Social Security Disability and he does not think they will accept depression and ADHD."  Id.  In his mental status exam, Dr. Lentz observed that the Plaintiff was somewhat obese, coughed constantly, with a loose, hacking cough, which the Plaintiff attributed to sinusitis, and that the Plaintiff fidgeted constantly, her psychomotor activity was generally increased, she interrupted frequently, her affect was of a full range and appropriate, her mood was anxious and depressed, she had normal speech, judgment and adequate abstraction, and moderate insight.  [T. 266].  Dr. Lentz also noted that the Plaintiff's associations were intact, with no hallucinations or delusions, no paranoia, and no suicidal ideas, she was alert and oriented on all three (3) axes, with normal attention and concentration, memory and cognition, fund of information and language skills.  Id.

Dr. Lentz assessed Major Depressive Disorder, Dysthmic Disorder, from a prior diagnosis, some symptoms of ADHD, and assessed a GAF of 45-50.[25]   [T. 266-67]. Dr. Lentz recommended an increase in the Plaintiff's dosage of Citapram to the maximum, with the possible addition of Wellbutrin, and suggested that the Plaintiff

---

[25]A GAF of 41 to 50 indicates "serious symptoms * * * OR any serious impairment in social, occupations, or school functioning."  Diagnostic and Statistical Manual of Mental Disorders at 34 (4th Ed. 2000).

see Lynn Jacobs.  [T. 267].[26]  In supplementary notes, Dr. Lentz related that the Plaintiff had complained to his receptionist that Dr. Lentz did not spend enough time with her, though their appointment lasted over an hour, which he opined was the kind of behavior that was clinically relevant, and was of the type that gets her into trouble with others.  Id.

Dr. Lentz saw the Plaintiff again on June 14, 2005, when she reported improvement from her last visit, and no side effects from Celexa.  [T. 264].  On July 22, 2005, Dr. Lentz observed that the Plaintiff continued taking Celexa and Trazodone as directed, and that all of her symptoms had improved since her previous visit, and he prescribed Wellbutrin SR, and Ambien as well. [T. 263].  The Plaintiff did not see Dr. Lentz again until October 14, 2005, when she reported that she was taking the medications as prescribed, and the only side effect was some sluggishness in the morning from the Ambien.  [T. 262].  Dr. Lentz recommended continuing the medications, but changed the timing of the dosages, and noted that the Plaintiff's Major Depressive Disorder was "in partial remission," but that she reported difficulty with her short-term memory, with attending to tasks, and with concentration.  Id.

---

[26]In her Disability Appeal Report, the Plaintiff related that Lynn Jacobs is a therapist who the Plaintiff had seen at least on July 1, 2005, and was scheduled to see, again, on August 1, 2005, "for emotional wellness planning."   [T. 157].

On November 18, 2005, Dr. Lentz reported that the Plaintiff's depression was now controlled, and "symptoms attributable solely to depression have resolved." [T. 261]. During that visit, the Plaintiff reported trouble doing tasks around the house, endorsed symptoms of combined ADHD, related problems sustaining attention, including that people had informed her that she did not listen to them, procrastination, difficulty organizing, avoidance of tasks that take prolonged mental effort, forgetfulness, and she reported that she was easily distracted and restless. Id. The Plaintiff also related that she talked excessively, blurted out answers before questions were finished, and had problems with waiting. Id. Dr. Lentz's physical exam of the Plaintiff revealed a full affect range, neutral mood, a tendency to answer questions before completely asked, but denial of suicide ideation, and adequate judgment. Id. Dr. Lentz assessed the Plaintiff with Major Depression, Dysthymic Disorder, and ADHD, and recommended that the Plaintiff continue with her current medications, and add Concerta. Id. Dr. Lentz did not assign any GAF scores, in his clinical notations, after the initial intake assessment.

The Plaintiff began to see M. Charmoli, Ph.D., on March 20, 2006. [T. 361]. During her initial appointment, Dr. Charmoli observed that the Plaintiff was on time, neatly dressed and groomed, alert, oriented, coherent, not responding to internal

stimuli, and had a speech rate and amplitude within the normal range. Id. Dr. Charmoli also observed that the Plaintiff was articulate, with a depressed affect, and appeared to be high average to above average in intelligence. Id. The Plaintiff's primary concern was depression and getting along with people, and she related that she lost her job with American Airlines in 1992, and had never been the same since. Id. The Plaintiff reported experiencing insomnia, chronic sinus infections, seasonal affective disorder, anxiety, and ADHD, and also related that SSA had lost her file, making it difficult for her to get benefits. Id. The Plaintiff reported that she was seeing Dr. Lentz, taking Citalopram, Wellbutrin, and Ambien, and had taken Trazadone, and that the sleep aides helped, but the antidepressants were variably effective. Id.

Dr. Charmoli informed the Plaintiff that she did not perform DIB evaluations, but that the Plaintiff was still open to completing the intake, and Dr. Charmoli assessed Major Depressive Disorder, single episode, Axis II deferred, and ADHD per the Plaintiff's report. Id. Dr. Charmoli also noted that the Plaintiff appeared quite depressed, cried throughout the interview, her energy appeared to be low, and that the prognosis was guarded to fair. Id. Dr. Charmoli recommended that their next appointment should be in three (3) weeks. [T. 362].

The Plaintiff also completed a BSI Test on March 20, 2006, [T. 363], and the results qualified her "as a positive clinical case," and suggested that a more intensive and detailed evaluation of mental status should be completed. [T. 365]. In particular, the examiner noted that extremely high levels of obsessive-compulsive symptoms were in evidence, as well as marked feelings of inferiority, and an extremely high level of depression, with a moderate level of anxiety. Id. The Plaintiff reported extremely high levels of anger, frustration, and intensely hostile feelings, and she exhibited extremely high levels of paranoid ideation, which were "almost certainly associated with a formal psychiatric disorder which possesses clear paranoid overtones." Id. In addition, the examiner noted the Plaintiff's extremely high psychoticism score, which would normally be associated with either a formal thought disorder or intense confusion and a sense of marked alienation arising from the presence of another psychiatric disorder. Id. The Plaintiff also related that she was easily annoyed, blocked on completing tasks, lonely, that her mind was often blank, and that she had trouble concentrating. [T. 366].

The Plaintiff saw Dr. Charmoli, again, on June 6, 2006, and she reported trouble with focus and concentration, and feeling lonely, discouraged, and easily distressed. [T. 358]. The Plaintiff also recounted that she rode a bike ten (10) miles per day,

enjoyed rollerblading, and used to enjoy swimming laps, but no longer swam.  Id.  The

Plaintiff also disclosed a history of sexual and physical abuse.  Id.  Dr. Charmoli

discussed day treatment, referred the Plaintiff to United Hospital and Fairview-

University, and discussed using "EMDR/brainspotting to address mood."  [T. 359].

Dr. Charmoli assessed Major Depressive Disorder, mixed Personality Disorder with

problems with relationships, authority figures and impulsivity, and observed that the

Plaintiff was thirty (30) minutes late for the appointment and had a depressed affect.

Id.  Dr. Charmoli planned to see the Plaintiff again in one (1) to two (2) weeks.  Id.

On August 10, 2006, the Plaintiff was seen by Dr. Bosacker for sleep problems,

Dr. Charmoli's next record is from June 13, 2006, wherein she notes that the

Plaintiff had cancelled their next appointment, and had asked for a referral to a

psychologist who would complete a DIB evaluation. [T. 360].  Dr. Charmoli opined

that the Plaintiff was not very motivated to address her emotional difficulties, but

might have been hoping to obtain DIB.  Id.

On August 10, 2006, the Plaintiff was seen by Dr. Bosacker for sleep problems,

and she related that she was taking Ambien.  [T. 58].  Dr. Bosacker noted that the

Plaintiff "[m]aybe worries a bit more than the average person," but that she denied

fatigue, weakness, weight change, fever, night sweats, polyphagia, polydipsia, or

polyuria, and hair growth changes.  Id.  Dr. Bosacker also observed that the Plaintiff

was pleasant and interactive, alert and oriented, in no acute distress, with coherent speech, normal rate and volume, and was able to articulate logical thoughts, and able to engage in abstract reasoning, without tangential thoughts, hallucinations or delusions. [T. 59].

The Plaintiff was seen by Dr. Buddy Lile for a psychiatric consultation on December 23, 2007, which was related to her anxiety attack, and she reported her history of depression and ADHD. [T. 23]. Dr. Lile observed that the Plaintiff was in no apparent distress, [T. 24], that she was cooperative, with appropriate eye contact, unremarkable activity and speech, but had excessive and overinclusive speech, with a rambling thought process, a normal mood, and a slightly labile affect. [T.25]. The Plaintiff was alert and oriented, with normal attention and concentration, no memory impairment, knowledge of current events and calculations, average intelligence, fair judgment, fair insight, and fair control of impulsivity. Id. Dr. Lile diagnosed generalized anxiety disorder, tobacco use disorder, suspect histrionic personality traits, and hypertension, but he did not assign a GAF. Id. Dr. Lile recommended that the Plaintiff begin therapy again, and cease the Wellbutrin prescription, because it increased anxiety. [T. 25-26].

3.    Other Records.

A.    Hearing Testimony.  The ALJ held the first Hearing on July 12, 2006, [T. 448], at which time, the Plaintiff appeared and was represented by legal counsel, [T. 450], and Rutenbeck testified as the VE.  [T. 470].  The Plaintiff made no objection to the exhibits, [T. 450], and, when the ALJ asked if all documents had been disclosed, her lawyer responded that some treatment notes from Dr. Charmoli were not yet in the Record, and notes from a therapist, named Rita Stanoch, would also be added.[27]  [T. 450-51].  The ALJ held the Record open for ten (10) additional days for the submission of those records. [T. 451].

The ALJ questioned the Plaintiff, who testified that she had a degree in Liberal Arts, [T. 452], and that she was not able to work for a variety of conditions, primarily because her emotions were "pretty out of control," with "a lot of negativity, frustration, disappointments," and emotional instability.  Id.  The Plaintiff testified that she had never been hospitalized, [T. 452], and had been seeing her current therapist for about six (6) months, and has been going to therapy since 1995, although she has "switched [therapists] quite a few times."  [T. 453].

The Plaintiff testified that she was currently not taking Celexa or Trazodone, but was taking medications for sinus infections, and Nasonex and Singulair, as well

_____

[27]The Record does not contain any notes from Rita Stanoch.

as Bupropion for depression, and Concerta, for ADHD, as prescribed by Dr. Lentz, but that she was not sure if the medications were helping, and she was dissatisfied with Dr. Lentz's care. [T. 454-55]. She also testified that she was very reliant on Ambien, [T. 458], but that it does not always work. [T. 459]. The Plaintiff testified that her ADHD causes her mind to work in "zigzag," such that she gets lost, and sometimes requires more than two (2) hours at the grocery store, even when she has a list, and can feel overwhelmed at other stores as well. [T. 456-57]. The Plaintiff testified she requires very strong antibiotics for her sinuses, [T. 463], and that her sinus infections are triggered by cold weather, being run down, and being near people, and that the antibiotics have weakened her immune system, [T. 464], which also prevents her from working.

With respect to her daily activities, the Plaintiff testified that she tries to keep house, and that her daughter was very self-sufficient, [T. 457], and that she drives her daughter places, but is very inefficient, cannot remember what she is doing, gets confused and frustrated, and has to call her husband for assistance. [T. 458]. The Plaintiff related that she sometimes does laundry and cooking, but that her family helps a lot. Id. The Plaintiff testified that she bikes ten (10) miles daily, for half of the year, goes to church weekly, enjoys watching courtroom television shows, and

enjoys reading "meaty" literature, but that she now she finds it difficult to stay focused on reading. [T. 459-60].

With respect to her work experience, the Plaintiff testified that her last gainful employment was with American Airlines, [T. 462], and that she had had approximately ten (10) different jobs since 1992, and did not leave any of them voluntarily. [T. 465]. With respect to her most recent job, the Plaintiff testified that she was fired after seeing a note, that was written by her supervisor, and that said that she did not get along with others, needed many instructions, could not keep concentration for long, and was high strung. [T. 465-66]. The Plaintiff testified that she would not be able to do customer service work, because she is always agitated, unable to stick with tasks, is not reliable, and has been that way since 2000. [T. 467]. The Plaintiff testified that she has few friends, [T. 467], cannot sustain frequent contact with her family, [T. 468], and that people find her annoying. [T. 469].

The ALJ next examined Rutenbeck, and posed a hypothetical person, who is forty-five (45) years of age, with a college education, and the Plaintiff's work experience, who is on medications which cause side effects of some insomnia and irritability, and who is impaired with obesity, chronic sinusitis, depression, long-standing dysthymia, osteoarthritis of the knees, and ADHD, and who can lift 50

pounds occasionally, and 25 pounds frequently, who cannot work at heights or on ladders or scaffolds, and who must work in a low stress environment, with few distractions, low to moderate standards for production and pace, only incidental contacts with the public, and brief and superficial contacts with co-workers and supervisors, and with no exposure to temperature or humidity extremes. [T. 470-71]. Rutenbeck testified that the hypothetical person would not be able to perform any of the Plaintiff's past relevant work, [T. 471], but that, at the unskilled medium or light occupational level, the Plaintiff would be able to work as a cleaner, in an industrial setting, or as a housekeeper or maid. [T. 471-72].

The ALJ then posed another hypothetical, with a similar individual, but a person who would be overwhelmed at times, and have to leave work, and who would be absent from work more than two (2) days per month, and Rutenbeck testified that such an individual would not be able to work in the regional or national economy. [T. 472]. Upon examination by the Plaintiff's attorney, Rutenbeck testified that the Plaintiff would not be able to work as a cleaner if she could not tolerate even minimal contact with others, [T. 472], or if she could not be exposed to any dust. [T. 473]. Upon reexamination by the ALJ, Rutenbeck testified that, if the Plaintiff could not be exposed to concentrated dust or fumes, then she could still work as a cleaner, but not

if she could not tolerate any exposure. [T. 474]. In closing, the ALJ asked the Plaintiff if she had anything else to add, which the Plaintiff did not. [T. 475].

At the second Hearing, which was held on September 26, 2006, the Plaintiff also attended with her attorney, and Norman testified as the VE. [T. 440]. The Plaintiff made no objection to the Exhibits, [T. 442], but objected to Norman testifying, and asserted that Rutenbeck had answered all of the relevant questions. [T. 443]. The ALJ overruled the objection, and posed a hypothetical individual, who was forty-five (45) years old, with a college education, the Plaintiff's work experience, who was taking medications that cause some insomnia and irritability, and with the impairments of obesity, chronic sinusitis, depression, dysthymia, ADHD, and osteoarthritis of knees, who is limited to lifting 50 pounds occasionally, 25 pounds frequently, and who can perform all functional aspects of medium work, except work at heights, or on ladders or scaffolds, and who would need to work in a low stress environment, with few distractions, low to moderate standards for production and pace, with only incidental contact with the public, and brief and superficial contact with others, no exposure to temperature, humidity, and no concentrated exposure to dust fumes, chemicals, gases, odors or airborne irritants. [T. 444-45].

Norman testified that the individual could not do the Plaintiff's prior work, but could be a hospital cleaner, or a semiconductor lead tester. [T. 445]. The ALJ then posed a second hypothetical, with the same criteria, except that the individual could only be exposed to chemicals, fumes, and dust for less than one-sixth (1/6) of the day. [T. 445-46]. Norman testified that the individual would not be able to work at any jobs. [T. 446]. In addition, Norman testified that his testimony was based upon Dictionary of Occupational Titles ("DOT"), but that, to the extent that the DOT did not account for exposure to particles, he based his testimony on his experience over the last 25 years, and that he had placed individuals, with such limitations, in job positions. Id. The Plaintiff's attorney did not question Norman. [T. 447].

        B.    <u>Employment Records</u>. The Plaintiff's earnings statement demonstrates that, from 1985 to 1989, the Plaintiff earned between $15,000 and $16,000 per year, which then dropped to approximately $8,000 in 1990, increased to $11,500 in 1991, fell back to $6,000 in 1992, fell to nearly no income, from 1993 to 1996, rose to $1700 in 1997, $6,500 in 1998, $2,157 in 1999, and $5,759.61 in 2000, and then fell to nearly no income, from 2001 to 2005. [T. 129-30]. In her Work History Report, the Plaintiff revealed that she had worked at American Airlines in administrative and passenger service, from 1987 to 1993, as a parking lot attendant

for high school children, from 1998 to 2000, and as a tutor for high school children, from January to December of 2000, and that those positions were full-time. [T. 163-65].

4.    The ALJ's Decision.  The ALJ issued her decision on January 10, 2007.  [T. 84].  As she was required to do, the ALJ applied the sequential, five-step analytical process, that is prescribed by Title 20 C.F.R. §§404.1520, and 416.920.[28]

---

[28]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy.  Id. at 754.

As a threshold matter, the ALJ noted that the Plaintiff had alleged an onset date of December 1, 2000, and had a date last insured of December 31, 2000. [T. 74]. At Step One, the ALJ determined that the Plaintiff had not engaged in any work activity from December 1, 2000, to December 31, 2000. [T. 76].

At Step Two, the ALJ examined whether the Plaintiff was subject to any medically determinable severe physical and mental impairments, id., and noted that the Minnesota Disability Determination Service ("DDS") medical examiners had concluded that there was insufficient evidence, in the Record, to establish a diagnosis during December of 2000, and so, had concluded that there was no basis upon which to establish disability. Id. The ALJ explained that the Record revealed no treatments during December of 2000, but, observing that conditions might exist over a longer period of time, the ALJ considered all of the evidence of Record, and concluded that the Plaintiff had severe impairments of obesity, chronic sinusitis, bilateral chondromalacia/patellofemoral syndrom, depression/dysthymia, and ADHD. [T. 77].

In reaching that conclusion, the ALJ relied upon medical records, which demonstrated that, in 1999, the Plaintiff was 5'5" and weighed 194 pounds., was 191 pounds in 2001, 208 pounds in March of 2002, and 175 pounds in 2004. Id. With respect to the Plaintiff's sinus condition, the ALJ relied upon the medical records,

which showed that the Plaintiff had a history of chronic sinusitis, had a nasal septoplasty on December 9, 1994, for a deviated septum, but had reported a return of symptoms within six (6) months. Id. The ALJ noted, from the records following the Plaintiff's surgery, [T. 197-98], that medication was helpful in the short term, but that bilateral endoscopic ethmoidectomies were suggested in August of 1995, with no evidence of surgery since then. [T. 77]. Relying upon the records from the Fairview-University Medical Center, the ALJ also noted that the Plaintiff was seen for chronic nasal congestion in February of 2002, and related that she had not had sinusitis since August of 2001, and was prescribed inhalers, nasal spray, and a humidifier, which improved her symptoms by March of 2002, and that, at a routine checkup in November of 2002, the Plaintiff reported that she "sometimes" used an inhaler. Id.

The ALJ also relied upon the records of Dr. Campanelli, who saw the Plaintiff in April of 2005, and to whom she reported a history of sinusitis, with severe episodes one (1) to three (3) times per year, but was at that appointment because she thought she was getting a sinus infection, and was treated with antibiotics, and advised to return, with no evidence that she did return. Id. The ALJ noted that the Plaintiff saw another doctor in the same clinic, Dr. Wilson, in June of 2006, for an assessment of her sinuses for her upcoming Hearing, and at that time, she reported experiencing five

(5) to fifteen (15) episodes of rhinosinal infections per year, and that she was weak and tired for two (2) to three (3) weeks at a time.  Id.  The ALJ noted that Dr. Wilson found no evidence of advanced sinus disease, and suggested a CT scan.  Id.[29]  The ALJ discussed Dr. Wilson's brief questionnaire, that he completed on August 2, 2006, in which Dr. Wilson opines that the Plaintiff could not tolerate more than minimal exposure to pulmonary irritants on a regular and consistent basis, since December 1, 2000, but the ALJ observed that the conclusion appeared to contradict the medical evidence that the Plaintiff had no records of allergies, and RAST testing, from 1994, was negative for all antigens tested.  Id.[30]

The ALJ found no evidence of other physical impairments, during the relevant time period, but found that the Plaintiff was seen for right knee pain in August of 2001, from increased activity -- biking and rollerblading -- and that the Plaintiff was advised to use ice and decrease those exercises.  [T. 78].  The ALJ also noted that the

_____

[29]While Dr. Wilson's record of the follow-up appointment with the Plaintiff was not before the ALJ, that record demonstrates that Dr. Wilson had concluded that there was no need for medical or surgical intervention.  [T. 48].

[30]The Record also reflects that at one (1) office visit for sinusitis, a box for "environmental allergies" was also checked, [T. 376], and Nasonex is indicated for use in the treatment and prevention of seasonal allergies.  Physicians' Desk Reference at 3166 (64th Ed. 2010).

Record disclosed that the Plaintiff went swimming regularly at the Y, id., and sought knee treatment, in February of 2002, after she fell taking snowboarding lessons, and was diagnosed with chondromalacia/patellofemoral syndrom, which had been aggravated by her fall, and was prescribed physical therapy and Celebrex, but was discharged from physical therapy due to poor compliance. Id.

With respect to her conclusions that were related to the Plaintiff's mental impairments, the ALJ relied upon Dr. Hanson's letter, that the Plaintiff had been treated for ADHD in 1996, and that, in August of 1999, the Plaintiff's primary physician had offered a Zoloft prescription, and the Plaintiff reported family-related stress, and that medication had helped in the past. Id. The ALJ observed that there was no evidence of mental health treatment, from 1999 to early 2003, but that the Plaintiff was seen by a psychologist for eighteen (18) sessions, from September of 2003, to February of 2004, for significant depression with obsessive/compulsive and paranoid ideation. Id. The ALJ also noted that, in 2003, the MCMI-II suggested diagnoses of delusional, anxiety, adjustment, and personality disorders, and that the Plaintiff was referred to Dr. Fox, in October of 2003, who diagnosed major depression, and prescribed Celexa, and with whom the Plaintiff followed up twice, in 2004 and 2005, and reported that she was taking medications only irregularly, and

experiencing symptoms of depression, and was advised to take her medications every day.  Id.  The ALJ noted that Dr. Fox referred the Plaintiff for a neuropsychological evaluation, which demonstrated average intelligence, attention problems consistent with ADHD, moderate depression on the self evaluations scale, and mild to moderate depression with mild anxiety on the MMPI.  Id.

The ALJ also considered the records of Dr. Lentz, to whom the Plaintiff had expressed that she was dissatisfied with Dr. Fox, and wanted a new opinion, because she felt she had a valid case for DIB, and Dr. Fox disagreed.  Id.  The ALJ noted Dr. Lentz's diagnoses of major depression, dysthymic disorder, and some symptoms of ADHD, and he prescribed medications, which she reported were somewhat helpful, and that the depression was controlled, but ADHD remained, for which Dr. Lentz adjusted the medications.  Id.  In addition, the ALJ relied upon Dr. Charmoli's records, who observed that the Plaintiff appeared depressed and cried throughout their first interview, and who informed the Plaintiff that she did not perform SSA evaluations, and that, later, the Plaintiff had cancelled a follow-up appointment, and asked for the names of psychologists who conducted SSA evaluations.[31]  Id.  The ALJ

_____

[31]The Record reflects that the Plaintiff went to one (1) follow-up appointment with Dr. Charmoli, and then cancelled the next appointment, and asked for a referral (continued...)

also made note of Dr. Charmoli's opinion, that the Plaintiff was not motivated for treatment, but wanted DIB. [T. 78-79].

The ALJ observed that there were no mental health records that were related to the relevant time period of December of 2000, but that the records most closely surrounding that time disclosed diagnoses, and treatment, for depression and/or dysthymia and ADHD. [T. 79]. The ALJ found that those impairments caused mild restrictions in the Plaintiff's activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties maintaining concentration, persistence, and pace, and no episodes of decompensation, such that the Plaintiff did not meet any of the Part C Criteria of Section 12.00. Id.

The ALJ based those conclusions on the evidence that the Plaintiff functioned appropriately in her home, and as a mother, and engaged in sporting activities for fun and exercise, but demonstrated difficulties with social interactions, as observed by her mental health providers, in addition to the Plaintiff's testimony that people tell her she talks too much and does not listen. Id. However, the ALJ noted that the Plaintiff's providers consistently observed that the Plaintiff's affect was appropriate, and her eye

_____

[31](...continued)
to a psychologist who would complete a DIB assessment. [T. 360].

contact, concentration, and thought processes, were intact.  Id.  In addition, the ALJ

noted that the response time on TOVA testing was variable, which Dr. Skeel had

noted was a hallmark of attention disorders, and that the Plaintiff had testified that her

ADHD was lifelong, and had been treated in the past, but that she was still able to

drive, read, graduate from college, and work for many years.

At Step Three, the ALJ concluded, based upon the medical records, that the

Plaintiff's obesity, chronic sinusitis, and bilateral knee disorder, did not meet or equal

any impairment contained in the Listing of Impairments through the date last insured,

and that the Plaintiff's mental impairments "did not result in marked or extreme

functional limitations," and did not meet or equal Sections 12.02 or 12.04 of the

Listings.  Id.

At Step Four, the ALJ formulated the following Residual Functional Capacity

("RFC")[32] for the Plaintiff:  lifting 50 pounds occasionally, and 25 pounds frequently,

sitting two (2) hours, and standing or walking six (6) hours of an eight (8) hour

workday, with no work at heights, ladders or scaffolds, in a low stress environment,

---

[32]RFC is defined in the Regulations as the most an individual can still do after
considering the effects of physical limitations that can affect the ability to perform
work-related tasks.  See, Title 20 C.F.R. §§404.1545, and 416.945, and Social
Security Ruling 96-8p.

with few distractions, low to moderate standards for production and pace, only incidental contacts with the public, and brief and superficial contacts with co-workers and supervisors, without temperature or humidity extremes, and with no concentrated exposure to dust, fumes, gases, chemicals, odors, or airborne irritants. Id.

The ALJ recognized that the Plaintiff had testified that her symptoms were more severe than that RFC, but that, following the dictates of Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), the ALJ did not find the Plaintiff's subjective complaints to be entirely credible, as to the intensity, persistence, and limiting effects, of her symptoms. [T. 80]. In particular, the ALJ noted that the objective medical record supported the diagnosis of ADHD, but that the Plaintiff's daily activities, including driving a car and riding a bicycle for ten (10) miles per day, would be very dangerous for someone with severe attention problems, but there was no evidence of any accidents. Id. However, the ALJ reduced the RFC to jobs with few distractions, and low to moderate standards for production and pace. Id. Based upon the Plaintiff's reports, and Dr. Lentz's observations, the ALJ also limited the Plaintiff's contacts with others, but noted that she could not eliminate all social interaction, because the Plaintiff was generally pleasant and appropriate with medical providers, was able to

go about in the community, and her social life included vacations and numerous recreational sports and lessons.  Id.

The ALJ also noted that she had considered the Plaintiff's depressive symptoms in the RFC, and accommodated those symptoms, but that those symptoms had been documented by Dr. Lentz to improve with medications.   [T. 81].  The ALJ also related that the Plaintiff had not seen a therapist, between 1996 and 2003, declined a prescription for Zoloft in 1999, had never been admitted to a psychiatric hospital, and that, when the Plaintiff went to mental health providers, she was often looking for a disability statement, and she had ceased treatment with Drs. Fox and Charmoli, because they were not supportive of DIB.  Id.

As for her physical impairments, the ALJ considered the Plaintiff's knee pain in restricting her to the medium exertional level, but found that additional restrictions were not supported by the Record, which demonstrated that the Plaintiff was physically active, and participated in biking, swimming, cross country skiing, and snowboarding.  Id.  With respect to the Plaintiff's sinusitis, the ALJ noted that, after the correction of the Plaintiff's deviated septum in 1994, she still had symptoms, but had not undergone any additional surgeries, and the next documentation of treatment

was from 2002,[33] when she was prescribed preventative measures, such as a nasal spray and an inhaler, which she used only "sometimes." Id. The ALJ also noted that the Plaintiff's testimony, that her sinuses were worsened in cold weather, was contradicted by her skiing and snowboarding activities, and her purported difficulty tolerating chemicals was undermined by her swimming regularly in a chlorinated pool. [T. 81-82].

The ALJ also considered later records, and noted that the Plaintiff had told Dr. Campanelli, in April of 2005, that she needed treatment because she was getting an infection, and wanted to go out of town -- which the ALJ concluded demonstrated that the Plaintiff was not disabled when suffering a sinus infection, [T. 82], and that the Plaintiff reported significantly fewer sinusitis episodes to Dr. Campanelli, than to Dr. Wilson, who she saw in 2006, for a DIB assessment, and that the Record did not support the lower number either, because there was no evidence of treatment for sinus

---

[33]The Record demonstrates that the Plaintiff spoke to Dr. Jones about a sinus infection on February 13, 1998, for which he recommended acidophillus, [T. 192], and that Dr. Jones completed a new hire medical assessment form, on February 16, 1999, related to temporary acute sinusitis, which was being treated with medication, and from which the Plaintiff was recovering, with a good prognosis. [T. 193]. Dr. Jones also related that he had treated the Plaintiff for acute sinusitis previously, on February 5, 1998, and in November of 1998, from which she had recovered. Id. After those notations, there are no records of the Plaintiff seeking or receiving treatment, for her sinus condition, until February of 2002.

infections, from February of 2002, to April of 2005.  Id.[34]  In addition, the ALJ gave little weight to Dr. Wilson's questionnaire, because that doctor only saw the Plaintiff once, on June 20, 2006, which was five and ½ years after her date last insured, and there was no evidence that he relied upon anything but the Plaintiff's report of the frequency of her sinusitis episodes, and his objective medical findings revealed no advanced sinus disease, and his only recommendation was a CT scan, which was not consistent with a disabling physical condition.  Id.[35]

At Step Four, the ALJ concluded, based upon the testimony of the VEs, that the Plaintiff was unable to perform her past work but, at Step Five, the ALJ concluded, again based upon the testimony of the VE, that the Plaintiff was capable of other work in the national and regional economy, as a hospital cleaner, of which there were 16,000 jobs in the State of Minnesota, or as a semiconductor lead tester, of which there were 1,300 jobs.  [T. 83].  The ALJ noted that the VE's testimony was inconsistent with the DOT, but that the inconsistency was due to the fact that the DOT

---

[34]The Record reveals that the Plaintiff had one (1) additional treatment for sinusitis in April of 2004.  [T. 376].

[35]As we have noted, the Plaintiff saw Dr. Wilson a second time, but the clincial notations for that visit were not in the records before the ALJ.  Nevertheless, those notations disclose that Dr. Wilson did not prescribe any treatments or surgeries for the Plaintiff. [T. 48].

does not address exposure to particulates, and the VE based his testimony on his own experience.  [T. 83-84].  Since the Plaintiff was able to do other work in the economy, the ALJ determined that she was "not disabled," through her date last insured of December 31, 2000.  [T. 84].

## IV.  Discussion

A.    Standard of Review.    The Commissioner's decision must be affirmed if it conforms to the law, and is supported by substantial evidence on the Record as a whole.  See, Title 42 U.S.C. §405(g); see also, Kluesner v. Astrue, 607 F.3d 533, 536 (8th Cir. 2010); Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision.  See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed.  See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998).  On

review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied. See, <u>Loving v. Secretary of Health and Human Services</u>, 16 F.3d 967, 969 (8th Cir. 1994); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See, <u>Neal ex rel. Walker v. Barnhart</u>, 405 F.3d 685, 688 (8th Cir. 2005); <u>Nelson v. Sullivan</u>, 966 F.2d 363, 366 n.6 (8th Cir. 1992); <u>Moad v. Massanari</u>, 260 F.3d 887, 890 (8th Cir. 2001). Stated otherwise, substantial evidence "is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." <u>Cox v. Barnhart</u>, 471 F.3d 902, 906 (8th Cir. 2006). Therefore, "[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits." <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004); <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008), quoting <u>Mapes v. Chater</u>, 82 F.3d 259, 262 (8th Cir. 1996). Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result. See,

Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal. See, Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006), citing Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001). Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record de novo. See, Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

B.     Legal Analysis.  In the Plaintiff's Motion for Summary Judgment, she

raises the following challenges to the decision of the ALJ:

> 1.     That the Appeals Council erred in refusing to amend
>         the onset date;
>
> 2.     That the ALJ was biased against the Plaintiff and, as
>         a result, the Plaintiff did not receive a fair Hearing;
>
> 3.     That the ALJ erred in formulating the Plaintiff's
>         RFC; and
>
> 4.     That the ALJ failed to fully develop the Record, such
>         that the decision was not supported by substantial
>         evidence on the Record as a whole.

See, Plaintiff's Motion for Summary Judgment, Docket No. 10; Plaintiff's
Memorandum in Opposition, Docket No. 16.

We address each contention in turn.

1.     The Onset Date.  The Plaintiff contends that her onset date should

be earlier, although she does not propose an alternate onset date.  See, Docket No. 16,

at p. 1 of 15.  The Plaintiff did not argue this point to the ALJ, but she raised it in her

appeal to the Appeals Council, and sought to have that date amended to January 1,

1999.  [T. 7, 424].  The Appeals Council denied the request to amend the onset date,

based upon its determination that the ALJ had assessed the period from 1994 forward,

such that an amendment would have no effect on the disability determination.  [T. 7].  We find no error in the decision of the Appeals Council on this point.

Due to the dearth of evidence that related to December of 2000, and observing that many conditions last for a significant duration, the ALJ considered the evidence from the surrounding time periods and, in particular, the ALJ noted that the Plaintiff had been treated for depression, and/or dysthymia and ADHD, but observed that the Plaintiff had not been treated by a therapist, between 1996 and 2003, had declined a prescription for an antidepressant in 1999,[36] and had never been admitted to a psychiatric hospital.   In addition, the ALJ considered evidence of the Plaintiff's physical impairments, which were related to her sinus infections, from her nasal septoplasty to correct a deviated septum, on December 9, 1994, to the most recent records available at the time of the ALJ's decision.  The ALJ noted that the Plaintiff had reported a return of sinus symptoms, within six (6) months after her surgery in 1994, and that her treating physician had recommended endoscopic ethmoidectomies

_____

[36]The Record contains pharmacy records, which demonstrate that the Plaintiff filled prescriptions for Zoloft, which is an antidepressant, in December of 1998; January, February, March, April, July, and December of 1999; and August, and October of 2000.  [T. 175-76].  On August 30, 1999, the Plaintiff reported to Dr. J. Green, that she inconsistently took Zoloft, which had been prescribed by her gynecologist, but declined Dr. Green's offer, of a new Zoloft prescription.  [T. 387].

in August of 1995, but that the Plaintiff had not had any further surgeries.  The ALJ

also considered that, in 2002, the Plaintiff was only treated with preventative

measures, such as a nasal spray and an inhaler, and reported her last bout of sinusitis

as occurring in August of 2001.[37]  The ALJ noted that, after that appointment, the

Plaintiff did not receive treatment for her sinus condition, from 2002 to 2005,

_____

[37]As we have noted, the ALJ appears to have overlooked Dr. Jones's records, which note -- very briefly -- that he treated the Plaintiff for sinus infections in February of 1998, possibly in November of 1998, with bronchitis, and in February of 1999.  Those records are contained in the same twelve (12) page exhibit as the Plaintiff's surgical records, which the ALJ plainly considered.

Dr. Jones's records do not contain any detailed observations, and reflect that the Plaintiff recovered completely from those infections, and required no restrictions at work.  Moreover, Dr. Jones's records demonstrate that the Plaintiff did not seek treatment for sinus problems, between August 3, 1995, and February of 1998, nor between February of 1999, and February of 2002, which is more than two (2) years after the date last insured.  As a consequence, although the ALJ did not discuss Dr. Jones's records specifically, we find any resulting error to be harmless, as the records would not have had any effect on the ALJ's RFC, for the relevant time period, and do not support the Plaintiff's claims as to the severity, or frequency, of her sinus infections.  See, Steed v. Astrue, 524 F.3d 872, 876 n. 5 (8th Cir. 2008)(finding the ALJ's misstatement of one (1) aspect of the plaintiff's treatment to be immaterial, as the ALJ's decision was still supported by substantial evidence); Brueggeman v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003)(an error is harmless when it would not affect the ALJ's decision); Reeder v. Apfel, 214 F.3d 984, 988 (8th Cir. 2000) (inaccuracies can form the basis for a remand, but not where they have no practical effect on the decision).  In addition, we find that Dr. Jones' records do not support an earlier onset date, as he reported that she would fully recover, and required no work restrictions from her sinusitis, and those findings do not demonstrate that the Plaintiff was disabled at that time.

although the Record shows that the Plaintiff did see a physician once for sinusitis, during that three (3) year period, and in 2006, Dr. Wilson observed that the Plaintiff showed no signs of advanced sinus disease.

We find no error in the Appeals Council's refusal to amend the Plaintiff's alleged onset date, from December 1, 2000, to January 1, 1999, because the Record does not support an earlier onset date, as, after her surgery in 1994, until 2002, and even later, the Plaintiff sought treatment for her asserted mental and physical impairments infrequently, and received only conservative treatments, and preventative measures. See, SSR 83-20 (1983)("The medical evidence serves as the primary element in the onset determination," and "the established onset date * * * can never be inconsistent with the medical evidence of record."). Further, the Plaintiff claimed, in her reports to the SSA, that she was working full time until December 1 of 2000, and so, as a result of the lack of medical records relating to the proposed onset date of January 1, 1999, as well as the contradiction, between the earlier date, and the Plaintiff's reports of her employment to the SSA, we find no error in the denial of her request. See, Karlix v. Barnhart, 457 F.3d 742, 747 (8th Cir. 2006) ("'[T]he date alleged by the individual should be used if it is consistent with all the evidence available,'" and finding that, where the Record did not support an earlier onset date,

the ALJ did not err), quoting SSR 83-20 (1983); Lopes v. Astrue, 277 Fed.Appx. 757, 759 (9th Cir., May 12, 2008)[unpublished](finding no error, because "[t]he medical evidence did not show that October 1995 was the disability onset date, and the ALJ properly used the alleged disability onset date as the starting point for her analysis."); Lewis v. Apfel, 236 F.3d 503, 510 (9th Cir. 2001)(ALJ did not err in refusing to amend onset date because the Record did not support an earlier onset date).

Morever, as we have noted, the ALJ considered the medical evidence from the earlier time period, in her determination that the Plaintiff's impairments were not disabling, and accounted for the Plaintiff's previous diagnoses, as well as her reports of symptom severity, to the extent supported by the Record, in determining the Plaintiff's RFC. As a consequence, an amendment of the onset date would have no impact on the Plaintiff's RFC, and therefore, we find that, to the extent the Appeals Council may have erred in refusing to amend the onset date -- which it did not -- any such error was harmless. See, Dewey v. Astrue, 509 F.3d 447, 449-50 (8th Cir. 2007) (an error is harmless when it would not affect the ALJ's decision); Brueggeman v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003)(same); Odette v. Commissioner of Social Sec., 2010 WL 2104300 at *10 (E.D. Mich., May 3, 2010)(finding the ALJ's

determination of date last insured to be harmless error, where the ALJ had considered

the entire record, and the decision "did not turn on Plaintiff's date last insured").

        2.    <u>ALJ's Alleged Bias</u>.  The Plaintiff also argues that the ALJ was

biased against her, thereby depriving her of an impartial Hearing Officer.

        a.    <u>Standard of Review</u>.  Of course, in an Administrative

Hearing as well as in a judicial proceeding, a party has, as a basic tenet of due process,

the right to be heard by an impartial decision maker.  See, <u>Keith v. Massanari</u>, 17

Fed.Appx. 478, 481 (7th Cir., August 23, 2001)[unpublished], citing <u>In re Murchison</u>,

349 U.S. 133, 136 (1955).  Administrative adjudicators enjoy a presumption that they

are unbiased, but a party can rebut that presumption by showing a "conflict of interest

or some other specific reason for disqualification."  <u>Rollins v. Massanari</u>, 261 F.3d

853, 857-58 (9th Cir. 2001); <u>Hunt v. Astrue</u>, 242 Fed.Appx. 376, 377 (8th Cir.,

September 20, 2007)[unpublished].  Further, the Supreme Court has counseled that,

in the context of a judicial proceeding, "expressions of impatience, dissatisfaction,

annoyance, and even anger, that are within the bounds of what imperfect men and

women * * * sometimes display," are insufficient to establish that an adjudicator was

biased.  <u>Liteky v. United States</u>, 510 U.S. 540, 555-56 (1994); see also, <u>Rollins v.</u>

<u>Massanari</u>, supra at 858 (to demonstrate bias, the plaintiff must show that "the ALJ's

behavior, in the context of the whole case, was 'so extreme as to display clear inability to render fair judgment.'").

In Weikert v. Sullivan, 977 F.2d 1249, 1254 (8th Cir. 1992), our Court of Appeals dismissed a plaintiff's claim of bias on the basis that he had failed to raise the issue at the Appeals Council stage but, in addressing the issue, the Court noted that the plaintiff's "particularized complaint [did] not amount to an allegation of pervasive unfairness," thereby reflecting that proof of a high intensity of bias would be required to sustain a challenge, on the basis of unfairness in the conduct of a Hearing. Likewise, in Ishom v. Schweiker, 711 F.2d 88, 90 (8th Cir. 1983), the Court dismissed another claim of bias, which had not been raised at the District Court level, and observed that, even "[i]f there was any bias shown by [the complained of] remarks, we think the ALJ corrected the problem by allowing a complete record to be made." See also, Mack v. Chater, 121 F.3d 712 (8th Cir., August 25, 1997)[Table decision](finding no indication of bias, where the ALJ had permitted development of a full and fair Record). Thus, within this Circuit, a claim of bias cannot be sustained without a showing of pervasive partiality, and will be assuaged by an ALJ's allowance of a full evidentiary Record.

b.    <u>Legal Analysis</u>.  Considering the Record as a whole, we are without a competent basis upon which to conclude that the Plaintiff was denied a fair Hearing on account of bias on the ALJ's part.  The Plaintiff points to no particular circumstance that could demonstrate bias, but instead, she relies upon rumor and subjective impression, that the ALJ, here, is known to be "anything but impartial."  See, <u>Docket No. 10</u>, at pp. 2-3 and 4 of 16.  Such rumors are insufficient to overcome the presumption of impartiality.  See, <u>Waters v. Astrue</u>, 2010 WL 2522702 at *14 (E.D. Mo., June 16, 2010)("To prove an ALJ's general bias, a claimant should be able to show both direct and circumstantial evidence of bias," such as testimony from attorneys, regarding an ALJ's regular use of incorrect law, or statistical evidence.); see also, <u>Kittler v. Astrue</u>, 231 Fed.Appx. 524, 526 (8th Cir., May 14, 2007) [unpublished](affirming decision, where the plaintiff had failed to provide evidence of ALJ bias).  There is nothing in the ALJ's questions to the Plaintiff, during the course of the Hearing, nor in her written decision, which so much as suggests that the ALJ bore any bias against the Plaintiff, or failed to properly consider all of the evidence of Record.  As a consequence, we find that the Plaintiff was afforded a fair Hearing, and we reject this challenge to the ALJ's decision.

3.     The RFC Formulation.  The Plaintiff contends that the ALJ erred in assessing her functional limitations, by improperly discrediting her subjective complaints, and argues that the ALJ overstated the Plaintiff's activity level, see, Docket No. 10, at pp. 3 and 9-11 of 16, placed inappropriate weight on the Plaintiff seeking disability statements from her providers, id. at p. 6 of 16; Docket No. 16, at p. 6 of 15, and placed too much emphasis on her inconsistent treatments.  See, Docket No. 16, at p. 1 of 15.

a.     Standard of Review.  The governing law makes clear that credibility determinations are initially within the province of the ALJ.  Driggins v. Bowen, 791 F.2d 121, 124 n. 2 (8th Cir. 1986); Underwood v. Bowen, 807 F.2d 141, 143 (8th Cir. 1986).  As a finding of fact, the determination must be supported by substantial evidence on the Record as a whole.  See, Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993).

To be legally sufficient, the ALJ must make an express credibility determination, must set forth the inconsistencies in the Record which led to the rejection of the Plaintiff's testimony, must demonstrate that all relevant evidence was considered and evaluated, and must detail the reasons for discrediting that testimony.  See, Shelton v. Chater, 87 F.3d 992, 995 (8th Cir. 1996); Hall v. Chater, 62 F.3d 220,

223 (8th Cir. 1995); <u>Ricketts v. Secretary of Health and Human Services</u>, 902 F.2d 661, 664 (8th Cir. 1990).  Those requirements are not mere suggestions, but are mandates that impose affirmative duties upon the ALJ.  See, <u>Johnson v. Secretary of Health and Human Services</u>, 872 F.2d 810, 814 n. 3 (8th Cir. 1989).

The mode and method by which an ALJ must make and support a credibility finding, on the basis of subjective symptoms, has been firmly established in the Eighth Circuit by <u>Polaski v. Heckler</u>, supra at 1322, and its progeny.  See, e.g., <u>Ostronski v. Chater</u>, 94 F.3d 413, 418-419 (8th Cir. 1996); <u>Shelton v. Chater</u>, supra at 995; <u>Jones v. Chater</u>, 86 F.3d 823, 826 (8th Cir. 1996).  Factors which the ALJ must consider, in the evaluation of the Plaintiff's subjective symptoms, include the Plaintiff's prior work record and the observations of third parties, and of physicians, concerning:

1.  the claimant's daily activities;

2.  the duration, frequency, and intensity of the subjective symptoms;

3.  precipitating and aggravating factors;

4.  dosage, effectiveness and side effects of medication; and

5.       functional restrictions.
Polaski v. Heckler, supra at 1322.

The ALJ must not only consider these factors, but she must list them and explain the resolution of any demonstrable conflict or inconsistency in the Record as a whole. Cf., Jones v. Chater, supra at 826; Delrosa v. Sullivan, 922 F.2d 480, 485 (8th Cir. 1991); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990).

It is well-settled that an ALJ may not disregard a claimant's subjective complaints of pain or other subjective symptoms solely because there is no objective medical evidence to support them.  See, Delrosa v. Sullivan, supra at 485; but cf., Johnston v. Shalala, 42 F.3d 448, 451 (8th Cir. 1995)(ALJ should consider absence of objective medical basis as a factor to discount the severity of a claimant's subjective complaints of pain).  It is also firmly established that the physiological, functional, and psychological consequences of illness, and of injury, may vary from individual to individual.  See, Simonson v. Schweiker, 699 F.2d 426, 429 (8th Cir. 1983).  For example, a "back condition may affect one individual in an inconsequential way, whereas the same condition may severely disable another person who has greater sensitivity to pain or whose physical condition * * * is generally deteriorated." O'Leary v. Schweiker, 710 F.2d 1334, 1342 (8th Cir. 1983).  Given this variability, an

ALJ may discredit subjective complaints only if those complaints are inconsistent with the Record as a whole.  See, <u>Taylor v. Chater</u>, 118 F.3d 1274, 1277 (8th Cir. 1997).

Nevertheless, as the decisions of this Circuit make clear, the interplay of the <u>Polaski</u> factors in any given Record, which could justify an ALJ's credibility determination with respect to a Plaintiff's subjective allegations of debilitating symptoms, is multi-varied.  For example, an individual's failure to seek aggressive medical care militates against a finding that his symptoms are disabling.  See, <u>Chamberlain v. Shalala</u>, 47 F.3d 1489, 1495 (8th Cir. 1995); <u>Barrett v. Shalala</u>, 38 F.3d 1019, 1023 (8th Cir. 1994); <u>Rautio v. Bowen</u>, 862 F.2d 176, 179 (8th Cir. 1988).  By the same token, "[i]nconsistencies between subjective complaints of pain and daily living patterns may also diminish credibility."  <u>Pena v. Chater</u>, 76 F.3d 906, 908 (8th Cir. 1996); see also, <u>Lawrence v. Chater</u>, 107 F.3d 674, 676-77 (8th Cir. 1997)(ALJ may discredit complaints that are inconsistent with daily activities); <u>Clark v. Chater</u>, 75 F.3d 414, 417 (8th Cir. 1996); <u>Shannon v. Chater</u>, supra at 487.  Among the daily activities, which contradict disabling pain, are: a practice of regularly cleaning one's house, see, <u>Spradling v. Chater</u>, 126 F.3d 1072, 1075 (8th Cir. 1997); <u>Chamberlain v. Shalala</u>, supra at 1494; cooking, <u>id.</u>; and grocery shopping, see, <u>Johnson v. Chater</u>, 87 F.3d 1015, 1018 (8th Cir. 1996).  Although daily activities, standing alone, do not

disprove the existence of a disability, they are an important factor to consider in the

evaluation of subjective complaints of pain.  See, <u>Wilson v. Chater</u>, 76 F.3d 238, 241

(8th Cir. 1996).

        b.    <u>Legal Analysis</u>.  Our review of the Record, inclusive of the

ALJ's decision, discloses that the ALJ adequately fulfilled her obligation to

thoroughly parse the Record, and provide a reasoned explanation for her believability

findings, which are supported by substantial evidence on the Record as a whole.  Here,

the ALJ's decision demonstrates that she properly considered the entirety of the

Record, including the history of treatment, the objective clinical findings, and the

observations and conclusions of the physicians and psychologists, as well as the

Plaintiff's activity level, in discounting the Plaintiff's claims.  See, <u>Choate v. Barnhart</u>,

457 F.3d 865, 871 (8th Cir. 2006).

    In particular, the ALJ properly considered that the Plaintiff rarely sought

treatment for her sinus problems -- and, in fact, the Record shows no treatment for

sinusitis for long periods of time, between 1996 and 1998, and between early 1999

and 2002, and then between 2002 and 2004.  See, <u>Wagner v. Astrue</u>, 499 F.3d 842,

851 (8th Cir. 2007)("'A claimant's allegations of disabling pain may be discredited by

evidence that the claimant has received minimal medical treatment and/or has taken

only occasional pain medications.'"), quoting <u>Singh v. Apfel</u>, 222 F.3d 448, 453 (8th Cir. 2000); <u>Goodale v. Halter</u>, 257 F.3d 771, 773 (8th Cir. 2001)(finding substantial evidence supported the ALJ's decision, where the "sparse record" showed minimal treatment for the impairment); <u>Smith v. Shalala</u>, 987 F.2d 1371, 1374 (8th Cir. 1993) (inconsistent and conservative treatments are inconsistent with disabling pain).

The ALJ also relied upon the records of the Plaintiff's treatment in 2002, for sinusitis, at which time, she was prescribed preventative measures, which the Plaintiff reported using only "sometimes," and that, since 1994, she had not required surgery for her sinus condition. See, <u>Black v. Apfel</u>, 143 F.3d 383, 386 (8th Cir. 1996) (conservative treatment indicates that an impairment is not as severe as alleged); <u>Thomas v. Barnhart</u>, 130 Fed.Appx. 62, 63-64 (8th Cir., March 18, 2005) [unpublished], citing <u>Smith v. Shalala</u>, supra at 1374. Further, the ALJ considered later records, which demonstrated that the Plaintiff sought antibiotics for a sinus infection, so that she could go on a trip for her fiftieth (50th) birthday -- which seriously detracts from the Plaintiff's reports that antibiotics provided no help, and that she was unable to function for two (2) to three (3) weeks after each infection.

Moreover, the ALJ also considered the inconsistency in the Plaintiff's reports to her physicians, that she experienced one (1) to three (3) severe bouts of sinusitis per

year, and later, when she was seeking Dr. Wilson's opinion for DIB, that she expressed experiencing five (5) to fifteen (15) episodes per year, which left her weakened for two (2) to three (3) weeks at a time, which suggests that the Plaintiff was motivated by secondary gain. See, <u>Davidson v. Astrue</u>, 578 F.3d 838, 844 (8th Cir. 2009)("'[A]n ALJ may discount a claimant's allegations if there is evidence that a claimant was a malinger [sic] or was exaggerating symptoms for financial gain.'"), quoting <u>O'Donnell v. Barnhart</u>, 318 F.3d 811, 818 (8th Cir. 2003); see also, e.g, <u>Strongson v. Barnhart</u>, 361 F.3d 1066, 1072 (8th Cir. 2004)(ALJ's credibility determination was supported by the Record, where "the nature of [the plaintiff's] pain complaints migrated from one location to another."). Moreover, Dr. Charmoli opined that the Plaintiff was seeking disability benefits, rather than attempting to address her mental health problems.

As with the Plaintiff's chronic sinus condition, the Record reflects that the Plaintiff received very little treatment for depression and ADHD, during the relevant time period and, in fact, had no treatment from 1999 to 2003. In addition, the Record reveals that the Plaintiff took Zoloft only inconsistently, and did not seek treatment with a therapist between 1996 and 2003. See, <u>Gowell v. Apfel</u>, 242 F.3d 793, 798 (8th Cir. 2001)(lack of evidence of ongoing treatment for mental health impairments

weighs against a claim of disability); <u>Gwathney v. Chater</u>, 104 F.3d 1043, 1045 (8th Cir. 1997)(The plaintiff's "failure to seek medical assistance for her alleged physical and mental impairments contradicts her subjective complaints of disabling conditions and supports the ALJ's decision to deny benefits."); <u>Shannon v. Chater</u>, supra at 486 (failure to seek treatment was inconsistent with a finding of disability). Even when Dr. Green offered the Plaintiff a prescription for Zoloft, in August of 1999, and encouraged to her return in order to discuss depression, the Plaintiff did not follow up. [T. 387-88].

While it may be the case that some claimants are unable to seek treatment due to expense, see, <u>Fuller v. Barnhart</u>, 328 F. Supp.2d 952, 956 (E.D. Ark. 2004), or for some other reason, see, e.g., <u>Conklin v. Astrue</u>, 360 Fed.Appx. 704, 706 (8th Cir., January 14, 2010)[unpublished](noncompliance with treatment can be a product of mental illness), there is absolutely nothing in this Record which would support such a finding, nor did the Plaintiff ever bring such a consideration to the attention of the ALJ, although she was provided an opportunity, at the Hearing, to voice any further comments. Indeed, the Record demonstrates that the Plaintiff sought medical care for an eye irritation, caused by a stye, on August 30, 1999, [T. 387]; for hammertoes on May 19, 2000, [T. 345], and on January 9, 2001 [T. 344]; for knee pain, on August 6,

2001, [T. 380]; continued to attend her yearly gynecological exams, [T. 217-21]; and Dr. Jones' records relate that he treated her for sinus infections only three (3) times in 1998 and 1999. [T. 193].

Further, the ALJ also properly considered that the Plaintiff's symptoms of her ADHD, and depression, improved when she was taking medications, as Dr. Lentz and Dr. Goering observed, to the point that Dr. Lentz concluded that the Plaintiff's depression was resolved. See, Medhaug v. Astrue, 578 F.3d 805, 816 (8th Cir. 2009)(an impairment is not disabling where it can be controlled through medication or other treatments), citing Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997). In addition, the ALJ accurately related that, in February of 2002, the Plaintiff was seen for chronic nasal congestion, and reported that her most recent bout of sinusitis was in August of the previous year, and that, upon receiving prescriptions for preventative measures, including inhalers, nasal spray, and a humidifier, the physician observed improvement in the Plaintiff's symptoms, in a follow up visit, id., and that Dr. Campanelli opined that the Plaintiff did not have good preventative care for her sinuses, and that she would likely benefit from a preventative regimen -- but the Plaintiff did not follow up with him. See, Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995)("Failure to follow a prescribed course of remedial treatment without good

reason is grounds for denying an application for benefits."), citing Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989); see also, Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004).

The ALJ's conclusion, that the Plaintiff's reports of her daily activities, including biking ten (10) miles per day, swimming laps in chlorinated pool, cross-country skiing, and driving, were inconsistent with the claimed severity of her symptoms, is also substantially supported by the Record as a whole. See, Wagner v. Astrue, supra at 851-52 (extensive daily activities are inconsistent with a finding of disability); see also, Medhaug v. Astrue, supra at 817; Clevenger v. Social Sec. Admin., 567 F.3d 971, 976 (8th Cir. 2009)(activities such as household chores, driving, attending church, and visiting with friends and relatives were not an unreasonable basis to discredit the claimant's complaints of disabling pain). In particular, the Plaintiff testified at the Hearing that she biked ten (10) miles daily for about half of the year, and testified that she "chauffeured" her daughter in the community which, as the ALJ observed, would be very difficult for a person with disabling attention problems. In addition, the ALJ noted the inconsistency between the Plaintiff's report that cold weather and chemicals exacerbated her symptoms, and her report that she skied, snowboarded, and swam regularly at a chlorinated pool at the Y.

We recognize that the Plaintiff submitted letters to the SSA, and documents to the Court, which dispute her own testimony, and the contemporaneous reports that are related to her activities [T. 418](concentration and difficulty at stores); 420-21 (swimming and biking)]; Plaintiff's Motion for Summary Judgment, supra at pp. 14, 15, 16 (swimming, snowboarding, and biking), and she asserts that she did not always seek treatment for her sinusitis, because she was too ill, or knew that the treatments would not help her.  See, Plaintiff's Motion for Summary Judgment, supra at pp. 14, 16.

We do not suggest that the Record was devoid of evidence which supported some of the Plaintiff's subjective complaints, but "[w]e will not disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints of disabling pain," or other symptoms, simply because, in the first instance, we might have reached a different assessment.  Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006), quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005), quoting, in turn, Gowell v. Apfel, supra at 796.  However, as we have noted, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."  Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001).  Accordingly, "[w]e will defer to the ALJ's findings," where, as here, "they are

sufficiently substantiated by the record." Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002); see also, Juszcyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008), citing Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007).

The Plaintiff also contends that the ALJ improperly discounted Dr. Wilson's opinion, that the Plaintiff could not tolerate more than minimal exposure to airborne particles in December of 2000. We find that the ALJ's conclusion is supported by substantial evidence, as Dr. Wilson's opinion was based upon a total of two (2) appointments with the Plaintiff, almost six (6) years after the date last insured, at which time, he concluded that the Plaintiff did not require medical or surgical intervention, and did not show signs of advanced sinus disease, and so, as the ALJ noted, his opinion was unsupported by medically acceptable clinical or diagnostic data, and was contradicted by the negative RAST allergy test, as well as the Plaintiff's history of regular swimming in a chlorinated pool. See, Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Barrett v. Shalala, supra at 1023; Ward v. Heckler, 786 F.2d 844, 846-47 (8th Cir. 1986); cf., Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991), citing Kirby v. Sullivan, 923 F.2d 1323, 1328 (8th Cir. 1991). Since we find no basis to reverse the ALJ's credibility rulings, we reject that challenge to the ALJ's determination as without merit.

4.    Development of the Record.  The Plaintiff argues that the ALJ failed to reconstruct the Record, after it had purportedly been lost by the SSA, and improperly came to her own medical conclusions, rather than obtaining a consultative medical examination.

a.    Standard of Review.  "Well-settled precedent confirms that the ALJ  bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case."  Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004)[citation omitted]; see also, Coleman v. Astrue, 498 F.3d 767, 771 (8th Cir. 2007)(citing same).  However, "[w]hile the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required 'to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.'"  Goff v. Barnhart, supra at 791, quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)(the ALJ is not required to further develop the Record where there is clinical data and observations pertinent to the plaintiff's functional limitations); see also, Hacker v. Barnhart, supra at 938 ("The regulations provide that the ALJ should recontact a treating physician when the information the physician provides is inadequate for the ALJ to determine whether the applicant is actually disabled."); Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008)(the claimant's failure

to provide information as to Step Four, where the claimant bears the burden of proof, "should not be held against the ALJ when there **is** evidence that supports the ALJ's decision.")[emphasis in original].

Put another way, "'an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" Warburton v. Apfel, 188 F.3d 1047, 1051 (8th Cir. 1999), quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994); Barrett v. Shalala, supra at 1023; see also, Strongson v. Barnhart, supra at 1071-72 (duty to develop the record 'includes the responsibility of ensuring that the record includes evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue."). In addition, to succeed on this claimed error, the Plaintiff must also show that the failure to develop the record was prejudicial to her. See, Haley v. Massanari, supra at 749-50 (ALJ was not required to order a consultative examination, where medical evidence addressed the impairments, substantial evidence supported the ALJ's decision, and the plaintiff made no showing of prejudice).[38]

--------------------------------------

[38]The Plaintiff asserts that the SSA lost her file, but she has pointed to no particular medical records that are missing and, when the ALJ asked the Plaintiff's
(continued...)

(...continued)

counsel, at the Hearing, if the Record was complete, he mentioned only that there were "still some treatment notes from a therapist that [the Plaintiff] recently started seeing," who was Dr. Charmoli, [T. 450-51], and the notes of Rita Stanoch, which the Plaintiff does not identify as missing. [T. 451]. The ALJ held the Record open for ten (10) days, in order to allow the additional records to be included, Dr. Charmoli's notes plainly were submitted, and the Plaintiff was able to submit even more records to the Appeals Council, which refutes the Plaintiff's argument, that there are relevant medical records that are not contained in the Record. See, Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993)("[I]t is of some relevance to us that the [plaintiff's] lawyer did not obtain (or, so far as we know, try to obtain) the items that are now being complained about."); Owens v. Astrue, 2008 WL 276299 at *3 (E.D. Ark., January 30, 2008) (supplementing the Record "creates a strong inference that, if there had been other medical records of importance from that time period, Plaintiff would also have submitted them[.]"); see also, Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); Good Face v. Astrue, 2008 WL 4861548 at *13 (D.S.D., November 7, 2008).

Notably, the Record contains no mention of the SSA losing records -- except the Plaintiff's own representations to that effect, [T. 98, 421-22, 436] -- but rather, the Record contains notations, from employees of the DDS, that Arden Woods, which is a private clinic where the Plaintiff received mental health treatment for approximately six (6) months during 1996, destroyed its records, due to a computer system change, as is confirmed by Dr. Hanson's letter. [T. 205, 215]. While the Plaintiff appears to argue that the ALJ was obligated to reconstruct those records, she has submitted no authority for such a proposition, and we find the argument without merit. While an ALJ is required to develop the Record, the Plaintiff must prove her own case, and we find no authority which requires an ALJ to reconstruct records that were independently destroyed by a medical provider. See, Young v. Apfel, 221 F.3d 1065, 1069 n. 5 (8th Cir. 2000).

Moreover, the ALJ accounted for the Plaintiff's diagnoses of depression and ADHD in her formulation of the RFC, which are referenced in Dr. Hanson's letter, and noted that the Plaintiff had participated in therapy in 1996. As a consequence, we
(continued...)

Here, the Plaintiff argues that the ALJ erred by failing to obtain a Medical Expert, to examine the Plaintiff and to testify at the Hearing, and by improperly coming to her own medical conclusions. In reaching her decision, the ALJ considered the Plaintiff's medical records, spanning from 1994 to 2006, which discussed the Plaintiff's physical and mental impairments, as well as the Plaintiff's testimony, and other non-medical evidence, and the Plaintiff has failed to identify what impairment was not adequately illuminated by the medical records of Record, nor has she articulated how she was prejudiced, by the ALJ's so-called failure to order a medical examination, other than to vaguely assert that her subjective complaints would have been reinforced by such an exam. As a consequence, we find that the Plaintiff has failed to show error, in the development of the Record. See, <u>Boyd v. Barnhart</u>, 258 F. Supp.2d 1013, 1019 (E.D. Mo. 2003)(ALJ was not required to order consultative examination, where there were medical records that discussed the impairment, which allowed the ALJ to make an informed decision.); <u>Knavel v. Astrue</u>, 2008 WL 2952205

---

[38](...continued)
find no merit in the Plaintiff's argument, that the Commissioner intentionally lost her file, was responsible to reconstruct records that had been destroyed by the Plaintiff's provider, or that the absence of the records that Arden Woods destroyed was prejudicial to her. See, <u>Reeder v. Apfel</u>, supra at 988 (an error is harmless where it has no practical effect on the decision).

at *4 (W.D. Mo., July 28, 2008)(same); <u>Boitel v. Astrue</u>, 2009 WL 3063365 at *5 (E.D. Ark., September 22, 2009)(finding no error where the evidence was sufficient to support the ALJ's conclusion); <u>Eidoen v. Apfel</u>, 1998 WL 1780693 at *3 (D. N.D., March 31, 1998).

Nonetheless, we acknowledge that, while the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 803 (8th Cir. 2005), the RFC is a "medical question" that must be based upon "some medical evidence," and the ALJ has the obligation to "'obtain medical evidence that addresses the claimant's ability to function in the workplace,'" <u>Wildman v. Astrue</u>, 596 F.3d 959, 969 (8th Cir. 2010), quoting <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001), notwithstanding the Plaintiff's burden to establish her RFC.  See, <u>Goff v. Barnhart</u>, supra at 790.

Further, the ALJ is not permitted to "draw [her] own inferences about [a] plaintiff's functional ability from medical reports," <u>Strongson v. Barnhart</u>, supra at 1070; however, this does not mean that the ALJ **must** obtain an RFC assessment from a physician, or other provider, as long as the Record contains medical "evaluations [that] describe [the plaintiff's] functional limitations with sufficient generalized clarity to allow for an understanding of how those limitations function in a work

environment," even if they do not explicitly reference "work." Cox v. Astrue, 495 F.3d 614, 620 n. 6 (8th Cir. 2007); see also, Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009)(records that demonstrated that the Plaintiff was encouraged to exercise constituted medical evidence supporting the RFC, even though there were no specific discussions of work restrictions in the records).

Here, we find that the RFC is supported by "some medical evidence." As was the case in Cox v. Astrue, supra, the ALJ relied upon Dr. Lentz's clinical observations, that the Plaintiff had difficulty with social interaction, including fidgeting, interrupting him, and answering questions before he had finished asking them. Those observations, and Dr. Lentz's conclusions, which are contained in the same records, that the Plaintiff's behavior "gets [her] into trouble with others," bear directly on the Plaintiff's ability to function in the workplace, and the ALJ properly accounted for them, in restricting the RFC to very limited contact with others. In concluding that the Plaintiff could sustain some contact with others, the ALJ accurately related that nearly all of the Plaintiff's providers noted that she was "pleasant" and "cooperative" during their examinations. [T. 54, 56, 59, 256, 259, 260, 309, 378, 379, 387, 411, 414, 415]. In addition, the Plaintiff was consistently observed to be alert and oriented, [T. 25, 59, 256, 260, 266, 311, 361, 402], with normal thought processes, and logical

thinking.  [T. 59, 256, 411].  Such medical evidence supports the ALJ's conclusions. See, <u>Halverson v. Astrue</u>, 600 F.3d 922, 933 (8th Cir. 2010)(substantial evidence supported the ALJ's decision, where the plaintiff's subjective complaints were contradicted by the medical records, that she "repeatedly appeared alert and oriented with normal speech and thought processes," and "behaved appropriately in her interactions with others.").

While Dr. Lentz also assigned a GAF of 45-50, which indicates serious symptoms, in his first session with the Plaintiff, in his subsequent notes, he observed significant improvement with medication, to the point of resolution of the Plaintiff's depressive symptoms, see, <u>Flynn v. Astrue</u>, 513 F.3d 788, 794 (8th Cir. 2008)(finding that substantial medical evidence supported ALJ's RFC, because the plaintiff's treating psychologist had found that medication helped, and the plaintiff was "doing well"), and Dr. Goering, in records which were not before the ALJ, but are now a part of the Record, assigned the Plaintiff a GAF of 70 in 1996, which supports the ALJ's conclusion that the Plaintiff retained the ability to function in the workplace.  See, <u>Nelson v. Sullivan</u>, supra at 366 ("[I]f * * * the Appeals Council considers the new evidence but declines to review the case, we review the ALJ's decision and determine whether there is substantial evidence in the administrative record, which now includes

the new evidence, to support the ALJ's decision."); <u>Bergmann v. Apfel</u>, 207 F.3d 1065, 1068 (8th Cir. 2000); see also, <u>Halverson v. Astrue</u>, supra at 931 (the ALJ did not err in discounting a single, outlier GAF score).

Further, in an earlier section of the ALJ's decision, she explicitly refers to the letter from Dr. Johnson, who is an acceptable medical source, see, <u>20 C.F.R. §416.913</u> (a licensed psychologist is an "acceptable medical source"), and who related that she had 18 sessions with the Plaintiff in 2003, and 2004, and who also opined that the Plaintiff "had sustained concentration and persistence, along with good memory skills," but "struggled with social interaction and adaptation," and that they had worked toward helping the Plaintiff achieve her "career goals," which also detracts from the Plaintiff's claim that she is completely disabled by her mental impairments, even though there are no treatment notes from Dr. Johnson. See, <u>Moore v. Astrue</u>, supra at 524 (medical evidence that physicians encouraged the plaintiff to be active supported the ALJ's decision, even without assessments of work restrictions). While the ALJ did not specifically reference those conclusions, in the section devoted to the RFC, it is plain that she considered Dr. Johnson's letter. See, <u>Black v. Apfel</u>, supra at 386 (an ALJ is not required to discuss every piece of evidence, and finding it

"highly unlikely" that the ALJ did not consider an opinion contained in treatment notes that the ALJ referenced).

In addition, the ALJ considered the results of the Plaintiff's TOVA test, that had indicated variable response time, which Dr. Skeel noted was a "hallmark" of ADHD and, based upon that, and the Plaintiff's subjective complaints -- to the extent they were not inconsistent with the record -- the ALJ limited the RFC to low to moderate standards for production and pace, in a low stress environment. Further, in assessing the mental RFC for the relevant time period, the ALJ considered the records of Drs. Fox and Charmoli -- and Dr. Lentz -- which noted that the Plaintiff had discontinued treatment with Drs. Fox and Charmoli, when they were not supportive of her application for DIB, with Dr. Charmoli going so far as to conclude that the Plaintiff's motivation was to obtain DIB, and not to address her mental health issues.

With respect to the physical RFC, the ALJ considered the medical evidence, that the Plaintiff had developed knee pain in 2002, as reflected in her treatment records, and restricted the Plaintiff to the medium exertional level, but also considered the Plaintiff's active lifestyle, in concluding that further restrictions were not required by the Plaintiff's obesity or knee impairment. As to the Plaintiff's sinus condition, the ALJ considered the records of the Plaintiff's surgery, in 1994, the records following

that surgery and, as we have observed, the ALJ properly found that Dr. Wilson's opinion was entitled to little weight. Nevertheless, the ALJ limited the Plaintiff's exposure to others, and limited the Plaintiff to no exposure to extremes of temperature, and no concentrated exposure to chemicals, fumes, and odors.

As the Commissioner underscores, the Record does not contain any opinion from a treating source which placed significant restrictions on the Plaintiff's activities, with the exception of Dr. Wilson's much later opinion, with respect to airborne particles, which the ALJ properly discredited, and that sparsity of significant restrictions, taken together with the other inconsistencies between the Record and the Plaintiff's subjective complaints, was an appropriate consideration in the ALJ's credibility ruling. See, Melton v. Apfel, 181 F.3d 939, 941 (8th Cir. 1999)(plaintiff's testimony was undermined by a lack of significant restrictions), citing Smith v. Shalala, supra at 1374; Cordell v. Astrue, 2009 WL 399733 at *6 (E.D. Ark, February 13, 2009).

While the absence of a medical source opinion related to functional limitations, where no opinion was sought, does not necessarily constitute "substantial evidence" of the absence of disability, for example, where the medical source has not discharged the plaintiff from treatment, see, Lauer v. Apfel, supra at 705; Hutsell v. Massanari,

259 F.3d 707, 712 (8th Cir. 2001), here, there is no evidence that the Plaintiff received **any** treatment for her purportedly disabling sinus condition, or her mental impairments, between February of 1999, and February of 2002 -- a three (3) year period which completely encompasses the period for which the Plaintiff was required to demonstrate disability. We would be remiss in assigning error to the ALJ, because no provider had been asked to provide an assessment of the Plaintiff's limitations, where no provider was even asked by the Plaintiff to provide any medical or mental health treatment for her claimed impairments. See, e.g., Steed v. Astrue, supra at 875-76 (finding no error in the ALJ's determination of the RFC at Step Four, where there were no assessments from physicians, because medical evidence supported the ALJ's decision); Goodale v. Halter, supra (finding substantial evidence supported the ALJ's decision, where the "sparse record" showed minimal treatment for the impairment).

Moreover, the RFC is supported by the employment form that Dr. Jones completed, although the ALJ does not explicitly refer to that opinion, where Dr. Jones disclosed that he was treating the Plaintiff for acute sinusitis, in February of 1999, that her prognosis was good, she was expected to recover, and had previously recovered fully, and that she required no restrictions. [T. 193]. See, Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000)(ALJ's decision was supported by substantial evidence,

including "some medical evidence" in the documented medical history, and the fact that at least one (1) physician had released the claimant to light duty work).

Despite the lack of treatment during the relevant time period, the ALJ generously afforded the Plaintiff the benefit of the doubt as to her subjective complaints, to the extent that they were not contradicted, or otherwise belied by the observations of her providers, by assessing the Plaintiff's contemporaneous reports to them, by closely examining the medical records, by carefully considering the observations and conclusions of the Plaintiff's providers, and by formulating an RFC that substantially limited the Plaintiff's contact with others, the level of concentration and pace required, and the Plaintiff's exposure to extremes of temperature and humidity, and to concentrated environmental pollutants. There is no evidence, in the Record presented, that the Plaintiff's limitations were more pronounced than those in the RFC formulated by the ALJ, even by the Plaintiff's contemporaneous self-reports of her symptoms. See, Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003)("It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC."); Pearsall v. Massanari, supra at 1217; Moore v. Astrue, supra

at 523 (the RFC is determined before Step Four, when the burden of proof is on the plaintiff to show disability).[39]

As a consequence, we find that the ALJ properly developed the Record, and that the RFC is supported by "some medical evidence," which is sufficiently clear to "allow for an understanding of how those limitations function in a work

_____

[39]On a related point, the Plaintiff contends that the ALJ failed to recognize her impairments of insomnia, high blood pressure, and "anxiety, etc." See, Plaintiff's Motion for Summary Judgment, supra at p. 16. However, the Plaintiff never alleged that those conditions were disabling, and she testified that her insomnia was fairly well controlled by Ambien, see, Medhaug v. Astrue, supra at 816 (impairment that is controlled by treatment is not disabling), her high blood pressure is not documented by a provider in the Record until 2007, [T. 20], almost seven (7) years after the date last insured, and the ALJ recognized that, in 2003, the Plaintiff's MCMI-III suggested a possible anxiety disorder, but the Plaintiff was not actually diagnosed with anxiety until 2003, or 2004. [T. 213]; see, Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007)(records from after the date last insured are relevant only when probative of the plaintiff's condition during the period of insured status), citing Rehder v. Apfel, 205 F.3d 1056, 1061 (8th Cir. 2000)(report from nontreating provider, completed fourteen (14) months after the date last insured, was not probative), and Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984)(later records were relevant to consideration of severity of symptoms during relevant time period).

The ALJ is not required to develop the Record on claims which are not presented by the claimant, or are otherwise apparent. See, Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003)(the ALJ is not required to investigate claims that are not presented at the time of application or at the time of the Hearing), quoting Pena v. Chater, supra at 909; Mouser v. Astrue, 545 F.3d 634, 639 (8th Cir. 2008)(the ALJ was not required to develop the Record, where it did not contain "evidence that would have put the ALJ on notice" of the newly-asserted impairment.).

environment," <u>Cox v. Astrue</u>, supra at 619 and n. 6, and is also supported by substantial evidence on the Record as a whole, considering all of the Plaintiff's impairments together. See, <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1024 (8th Cir. 2002)(the "determination of residual functional capacity is based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"), quoting <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000); <u>Flynn v. Astrue</u>, supra at 792 (the RFC must be supported by "some medical evidence," as well as other relevant evidence, such as observations of physicians and others, and the plaintiff's own description of the limitations); <u>Miles v. Barnhart</u>, 374 F.3d 694, 700 (8th Cir. 2004)(the ALJ must consider all of the Record, in formulating the RFC); see also, <u>Wildman v. Astrue</u>, supra at 969-70 (the RFC, which was based upon the ALJ's independent review of the medical records, the treatment notes of a physician, the opinion of a consulting physician, the plaintiff's sporadic work history and lack of motivation, and repeated and unjustified noncompliance with treatment recommendations, was supported by substantial evidence.).

Upon promulgating the RFC, which is supported by substantial evidence of Record, for the VE's consideration at the Hearing of September 26, 2006, the ALJ was

entitled to rely upon the VE's testimony, as long as it did not impermissibly conflict with the DOT.  See, <u>Porch v. Chater</u>, 115 F.3d 567, 572 (8th Cir. 1997).  Here, the VE testified that, to the extent that the DOT did not account for the limitation with respect to environmental pollutants, he had relied upon his extensive career experience, as he had previously placed individuals with similar limitations, and the ALJ properly relied upon the VE's testimony.  See, <u>SSR 00-4p</u> ("Neither the DOT nor the VE * * * evidence automatically 'trumps' when there is a conflict," and "[t]he adjudicator must resolve the conflict by determining if the explanation given by the VE * * * is reasonable and provides a basis" to rely on it, for example, when the VE's testimony includes information not listed in the DOT based on his experience.); <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1434 n. 7 (8th Cir. 1995)(the ALJ can rely on the VE's testimony, which departs from the DOT, where the ALJ makes findings of fact which support the departure); <u>Wheeler v. Apfel</u>, 224 F.3d 891, 897 (8th Cir. 2000) (VE's testimony, based on a proper RFC, was not inconsistent with the DOT, even though the claimant could not perform the full range of light work, because "not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT.").

As a consequence, the ALJ's decision, that the Plaintiff is not disabled, because she could perform work existing in the regional and national economy as of the date last insured, is supported by substantial evidence. See, <u>Page v. Astrue</u>, 484 F.3d 1040, 1045 (8th Cir. 2007), quoting <u>Haggard v. Apfel</u>, 175 F.3d 591, 595 (8th Cir. 1999)("A vocational expert's testimony based on a properly phrased hypothetical question constitutes substantial evidence.").

In sum, finding no merit to the Plaintiff's challenges to the decision of the ALJ, we recommend that the Plaintiff's Motion for Summary Judgment be denied, and that the Defendant's Motion for Summary Judgment be granted.

NOW, THEREFORE, It is --

RECOMMENDED:

1.      That the Plaintiff's Motion for Summary Judgment [Docket No. 10] be denied.

2.      That the Defendant's Motion for Summary Judgment [Docket No. 11] be granted.


Dated:  July 26, 2010                             *s/Raymond L. Erickson*
                                                  Raymond L. Erickson
                                                  CHIEF U.S.  MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than August 9, 2010**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete

transcript of that Hearing **by no later than August 9, 2010**, unless all interested

parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to

review the transcript in order to resolve all of the objections made.